1   Eric A. Pulver, Nevada State Bar No. 07874
    Logar Pulver 1875 Plumas Street, Suite 1
2   Reno, NV 89509
    Tel.: 775 786 5040;
3   Fax: 775 786 7544
    E-mail: eric@logarpulver.com
4
    Peter Chase Neumann, Nevada Bar No. 00636
5   136 Ridge Street
    Reno, NV 89501
6   Tel.: 775 786 3750
    Fax.: 775 786 7544
7   E-mail: petercneumann@sbcglobal.net

8                    **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**
9

10      MICHAEL J. FLYNN,                    3:09-CV-00422-PMP-RAM

11              Plaintiff

12          vs.                              RESPONSE IN OPPOSITION TO MOTION TO
                                             DISMISS FIRST AMENDED COMPLAINT
13      LINER GRODE STEIN YANKELEVITZ
        SUNSHINE REGENSTREIF & TAYLOR        **HEARING REQUESTED**
14      LLP, DEBORAH A. KLAR, and TERI
        PHAM,
15
                Defendants
16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, Michael J. Flynn, by and through his undersigned counsel, hereby submits this Response in opposition to the Defendant Liner firm's Motion to Dismiss.  Mr. Flynn also requests that this Court conduct a hearing on Defendant's Motion to Dismiss.

## 1.    BACKGROUND

As this Court knows,[1] Plaintiff's instant lawsuit against Defendant has its genesis in the eTreppid case (defined in footnote 1) and is the unfortunate result of "scorched earth litigation" strategies employed by attorneys working for the Defendant Liner firm to "crush [Plaintiff] into submission" and "to exploit legitimate legal proceedings to harass and punish Mr. Flynn."  See Docket No. 985, Case No. 3:06-56 ("Sanctions Order") at pp. 45-46.  In the eTreppid case, This Court found that attorneys Pham and Klar who then worked for Defendant Liner repeatedly and knowingly participated and facilitated the fraud that Dennis Montgomery was perpetrating on this Court and in various tribunals in California and Massachusetts.  This Court even found that attorney Klar repeatedly engaged in conduct that constituted contempt of this Court.  All of the facts concerning the acts of contempt and perjury that Defendant's employees (Klar and Pham) participated in are detailed in this Court's 54-page Sanctions Order.  While there are a plethora of facts outlined in the Sanctions Order, Judge Cooke condensed and summarized those facts in the following excerpts:

---

[1] In ruling on Defendant's Motion to Dismiss, Mr. Flynn requests that this Court take judicial notice of the order at Docket No. 985, Case No. 3:06-cv-00422 ("eTreppid case") and the proceedings within the eTreppid case and the other documents within the eTreppid case which are specifically referenced herein.  In ruling on a motion to dismiss under Rule 12(b)(6), a court may consider matters of which the court could take judicial notice.  *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988) ("In addition to the complaint, it is proper for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss.").  Courts may take judicial notice of court filings and other matters of public record.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006).  Plaintiff also asks this Court to take judicial notice of the Supplemental Affidavit of Timothy L. Blixseth and supporting exhibits filed at Docket Nos. 2118, 2118-1 to 2118-12 in the U.S. Bankruptcy Court for the District of Montana, Case No. 08-61570.  Mr. Blixseth's Supplemental Affidavit demonstrates how the fraud perpetrated on this Court and the U.S. Government by Defendant, Edra Blixseth and Dennis Montgomery has infected bankruptcy proceedings of the Yellowstone Mountain Club that Ms. Blixseth obtained ownership of in August of 2008.  It appears that the 9th Circuit and U.S. District Court for the District of Montana has taken notice of how Bankruptcy Judge Kirscher has been infected by Edra Blixseth's frauds as these court have Bankruptcy Judge Kirscher and disagreed with him multiple times after taking notice of how Bankruptcy Judge Kirscher has been tainted by Edra Blixseth's fraud.  See 9th Cir. Case No. 10-80198, Docket No. 20; U.S. District for the District of Montana, Case No. 09-47, Docket No. 72.

Apart from the litigation misconduct and contempt of this court described above, there is another very <u>disturbing subtext</u> about what occurred.  It is evident that when Mr. Flynn and Mr. Montgomery parted company in July 2007, there was tremendous animosity between the two . . . .  By her conduct as lead counsel in these proceedings, Ms. Klar allowed her clients to involve the Liner firm, Ms. Pham and herself in a scheme to exploit legitimate legal proceedings to harass and punish Mr. Flynn.  Ms. Klar crossed over the line as a zealous advocate for her clients' interests and abdicated her ethical and professional duties to the court in advancing this strategy.  (Case No. 3:06-cv-00422, Docket No. 985 at pp. 45-46) (emphasis added).

. . .

Ms. Klar was allowed to operate in the Liner firm unchecked and unquestioned, and this conclusion is supported by her pattern of sanctionable conduct that ensued <u>long after the fall of 2007</u>.  It was not <u>until matters came to a head in the summer of 2008</u> that senior partners finally stepped in to this case.  The court finds that the Liner firm acquiesced to or willingly carried out Ms. Klar's litigation strategy; therefore sanctions against the Liner firm are warranted pursuant to 28 U.S.C. § 1927.  (*Id*. at p. 48) (emphasis added).

. . .

<u>In July 2008</u>, senior partners in the Liner firm finally stepped into this case, but this was only after several sanction orders had been issued, and both Ms. Klar and Mr. Montgomery were facing very serious allegations unrelated to the issues currently before this court.  It was also months after Ms. Klar's unsuccessful campaign to divest this court of jurisdiction and to defeat Mr. Flynn at any cost.  (*Id*. at p. 50.).

. . .

Even if Ms. Klar and Ms. Pham's conduct was not totally frivolous, the court finds they were motivated by vindictiveness and bad faith.  (*Id*. at 37).

. . .

As the senior attorney and lead counsel in this case, Ms. Klar abdicated her duties to the court and the attorneys she supervised by engaging in a <u>consistent pattern of gamesmanship, misrepresentations, and outright contempt</u> of this court and its orders.  She was unrelenting in her campaign to achieve her desired end – to wrest jurisdiction from this court over the fee dispute and client files – and she was <u>willing to do so at any cost</u> to her client,

1    to her junior partner, to the Liner firm, to Mr. Flynn, and to the
     court.  (*Id.*) (emphasis added).

2        This Court previously recognized in the Sanctions Order that there exists a "disturbing

3    subtext" in the litigation conduct of Defendant and its agents against Mr. Flynn.  This subtext

4    included Defendant's agent, Ms. Klar, engaging in a "consistent pattern of gamesmanship,

5    misrepresentations, and outright contempt" in her "unrelenting . . . campaign to achieve her

6    desired end . . . and she was willing to do so at any cost . . . to Mr. Flynn."

7        It is within this "disturbing subtext" that this Court must view the allegations of Plaintiff's

8    First Amended Complaint.  When viewed within this "disturbing subtext", Plaintiff's allegations

9    of Defendant's knowing participation in Montgomery's computer hacking are not only

10   "plausible" for purposes of *Twombley, Iqbal*, and F.R.C.P. 8, but they are wholly consistent with

11   and provide a full picture of the "unrelenting" "campaign" of litigation war that Defendant,

12   through its agent, waged "at any cost" against Plaintiff and which should not be suppressed with a

13   motion to dismiss, particularly where sufficient facts are alleged.  The litigation privilege surely

14   does not permit an attorney to do whatever they want, even engage in criminal conduct, and then

15   hide behind the litigation privilege, as Defendant is trying to do.  Indeed, a similar situation arose

16   in the case *Leor Exploration & Production, LLC v. Aguiar*, Case Nos. Nos. 09-60136, 09-60683,

17   2010 WL 3782195 (S.D.Fla., September 28, 2010), where a district court judge imposed

18   sanctions on a party who had a "win-at-all-costs attitude" with regard to the litigation and

19   employed computer hacking against his adversaries as one method of implementing his win at all

20   costs strategy.  *Leor Exploration & Production,* 2010 WL 3782195 at **2-12.

21       Similarly here, Defendant engaged in an unrelenting litigation war against Plaintiff which

22   has caused him significant harm, not only monetarily, but also physically.  Plaintiff's First

23   Amended Complaint describes the rest of the story that this Court was not aware of when it issued

24   the Sanctions Order.  The rest of the story as detailed in the First Amended Complaint, explains

25   how Defendant, through its agents Ms. Klar and Ms. Pham, engaged in a full scale litigation war

26   against Plaintiff that involved their knowing participation in computer hacking and obtaining

27   fraudulent loans for the purpose of fully executing their winning "at any cost" strategy against

28   Plaintiff that they engaged in to "harass and punish Mr. Flynn."

As detailed in Mr. Flynn's Motion for Sanctions filed in the eTreppid case at Docket No. 545 and supporting documents, the purpose of the litigation war that Defendant waged against Mr. Flynn was to "harass and punish Mr. Flynn" because Mr. Flynn had realized that the Defendant's clients, Edra Blixseth and Dennis Montgomery, were perpetrating a fraud on the U.S. Government by trying to obtain a $100 million black budget contract based on non-existent, if not phony, terrorist detecting software.  Because Mr. Flynn had no choice but to expose this fraud and because the fraud of Edra Blixseth and Montgomery was demonstrable as the FBI found, Defendant was faced with the same decision that Mr. Flynn was faced with when he discovered the fraud; the Defendant Liner firm had to decide whether to withdraw from its representation of Edra and Montgomery for ethical and professional reasons, or "double-down" by compounding Edra and Montgomery's fraud with its own fraudulent conduct pursued for the purpose of winning the proverbial pot of gold at the end of the rainbow, which was the $100 million "black budget" contract.  Unfortunately, Defendant chose to "double-down" and in doing so "crossed over the line as a zealous advocate for [its] clients' interests and abdicated [its] ethical and professional duties . . . "  Sanctions Order at p. 46.  When it decided to facilitate the fraudulent scheme of Edra and Montgomery, Defendant's only course of conduct was to beat Plaintiff into "submission" to silence and prevent him from exposing Edra and Montgomery's fraud because only through silencing Plaintiff could Edra and Montgomery be awarded their $100 million "black budget" contract.  Therefore, to fund this silencing of Plaintiff, Defendant committed numerous acts of bank and lending fraud when it facilitated and arranged for Edra Blixseth to obtain over $50 million in loan proceeds based on knowingly false financial statements.  As alleged in the First Amended Complaint (¶ 45), Defendant introduced Wachovia to Edra Blixseth as a lender then represented Edra in her loan transaction with Wachovia and in doing so, helped Wachovia secure its $8 million loan to Edra based on the terrorist detecting technology that Liner knew was phony.  Those loan proceeds were then used to fund the "consistent pattern of gamesmanship, misrepresentations, and outright contempt" (Sanctions Order at p. 37) that Defendant employed before this Court against Plaintiff.

As alleged in the First Amended Complaint, Defendant also knowingly participated in the

computer hacking that it knew Montgomery was engaging in against his litigation adversaries. Again, having decided to "double-down" and participate and compound the fraud of Edra and Montgomery, Defendant engaged in a "total war" litigation campaign against Plaintiff to beat him into submission.  In fact, Defendant had no choice but to "win at all costs" once it decided to continue its representation of Edra and Montgomery because to lose in any regard would necessarily expose Defendant's knowing participation in a $100 million fraud on the U.S.C Government.  Given the documented and adjudicate vexatious litigation conduct of Defendant, the allegations in the First Amended Complaint are more than plausible.[2]

## 2.   PLAINTIFF HAS STATED A CLAIM UNDER 18 U.S.C. § 1030 AGAINST THE LINER FIRM

### A.   Plaintiff Has Properly Alleged Actionable Damages Against Defendant Under 18 U.S.C. § 1030

In this Court's October 15, 2010 Order, it stated that Plaintiff's claim against Defendant under 18 U.S.C. § 1030 was deficient because it did not sufficiently describe the physical injury suffered by Plaintiff as a result of Defendant's violations of § 1030.  See Order at Doc. # 71, p. 12.  This Court gave Plaintiff leave to amend his Complaint to cure this deficiency.  *Id*. at p. 13.

Plaintiff has cured this defect with his First Amended Complaint.  See First Amended Complaint at ¶¶ 34, 39.  18 U.S.C. § 1030(g) allows a civil litigant to maintain an action against any person who violates the provisions of Section 1030 where the plaintiff has suffered one of the enumerated categories of damages set forth in subclauses (I)-(V) of 18 U.S.C. § 1030 (c)(4)(A)(i). In turn, 18 U.S.C. § 1030(c)(4)(A)(i)(III) provides "physical injury to any person" as an enumerated category of damages for a violation of Section 1030(a).  Plaintiff's First Amended Complaint chronicles in detail the specific physical injury suffered by Plaintiff as a result of

---

[2] Plaintiff respectfully disagrees with this Court's dismissal with prejudice of Plaintiff's malicious prosecution and abuse of process claims that he asserted against Defendant.  The import of this Court's dismissal with prejudice is to remove all accountability from law firms which allow its attorneys to operate unchecked as they engage in vexatious litigation conduct.  In fact, a complaint filed seeking a writ of possession or similar relief based on ulterior motives, as occurred here, gives rise to a claim for abuse of process.  See *Tranchina v. Arcinas*, 178 P.2d 65 (Cal. App. 1947); *Sellens v. Spellens*, 317 P.2d 613 (Cal. 1957) (improper use of claim and delivery upheld as abuse of process). Plaintiff intends to appeal this Court's order dismissing his abuse of process and malicious prosecution claims.

1    Defendants' violations of Section 1030(a).  In particular, Plaintiff details how he suffered from a

2    debilitating case of Shingles between October and December of 2008, the onset of which was

3    caused from the stress of knowing that Defendants were conspiring with Montgomery to gain

4    unauthorized access into Plaintiff's computers and use information gained from that unauthorized

5    access to harass and intimidate Plaintiff.  See First Amended Complaint at ¶¶ 34, 39.

6         Thus, on the face of the First Amended Complaint, Plaintiff has adequately alleged that he

7    suffered a compensable physical injury under 18 U.S.C. § 1030(g).  Defendant attempts to argue

8    that Plaintiff's case of Shingles (a physical injury) is not in fact a physical injury but is merely a

9    manifestation of emotional distress.  Be that as it may, Defendant offers no legal authority to

10   support its position that a physical injury that is a manifestation of emotional distress is exempted

11   from the definition of "physical injury to any person" as set forth in 18 U.S.C. §

12   1030(c)(4)(A)(i)(III).  Thus, Plaintiff's alleged physical injuries fall squarely within the definition

13   of 18 U.S.C. § 1030(c)(4)(A)(i)(III), Defendant's Motion to Dismiss on this point must be denied.

14        Moreover, Defendant argues that Plaintiff's allegation of suffering from shingles as a

15   result of its conspiracy to violate 18 U.S.C. § 1030 is deficient because Plaintiff does not explain

16   "how he contracted shingles (a viral condition) . . . ."  This argument is unavailing.  For purposes

17   of ruling on a motion to dismiss under Rule 12(b)(6), this Court must accept as true all material

18   facts in the First Amended Complaint and construe them in a light most favorable to Plaintiff.

19   *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996).  Under this standard, Plaintiff

20   adequately alleges that the Defendants' conduct in violation of 18 U.S.C. § 1030 caused a "flare-

21   up" of his Shingles.  Thus, Plaintiff adequately alleged that he did not contract a new case of

22   Shingles, but rather Defendants' conduct aggravated his dormant shingles virus which caused him

23   excruciating pain.  Thus, Defendant's argument in this regard is unavailing and its Motion to

24   Dismiss on this point must accordingly be denied.[3]

25

26   _____

27   [3] At several points in its Motion to Dismiss, Defendant incredibly argues that Plaintiff is to blame
     for Defendants' violation of 18 U.S.C. § 1030 because Plaintiff did not take adequate security
     measures to protect his computer from Montgomery's unauthorized access.  See e.g., Motion to

28   Dismiss at p. 13, n. 5.  Defendant cites no legal authority to support its position that Plaintiff's
     supposed fault in this regard should justify granting a Rule 12(b)(6) motion to dismiss.

**B.** **Plaintiff Has Stated a Plausible Claim of Aiding and Abetting Violations of 18 US.C. § 1030 Against Defendants**

A complaint is sufficient where it merely alleges sufficient facts which, if true, would provide adequate grounds for the plaintiff's entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "There is a strong presumption against dismissing an action for failure to state a claim." *Plum Creek Timber Co., Inc. v. Trout Unlimited*, 255 F.Supp.2d 1159, 1162 (D. Idaho 2003). In considering a motion to dismiss pursuant to Rule 12(b)(6), "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir.1998) (citation omitted). The Supreme Court, expanding on *Twombly*, held as follows in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009):

> [T]he pleading standard [under Fed. R. Civ. P.] 8 does not require "detailed factual allegations, but it demands more than an unadorned, the defendant unlawfully harmed me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of further factual enhancement.

Where a complaint contains sufficient factual matter which, if accepted as true, "state[s] a claim to relief that is plausible on its face," the complaint will survive a motion to dismiss. *Id.* (citing *Twombly*, 550 U.S. at 570). For a claim to have facial plausibility, the plaintiff must plead facts that allow the court to reasonably infer that the defendant is liable for that which is alleged. *Id.* (citing *Twombly*, 550 U.S. at 556). In evaluating a complaint's adequacy at the motion to dismiss stage, a court must "presume that general allegations embrace those specific facts . . . necessary to support the claim." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 982 (9th Cir. 2008) (citing *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004)).

Under a Rule 12(b)(6) motion, factual challenges to a complaint have no bearing on the legal sufficiency of the allegations. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

As to "plausibility" and satisfying the pleading standards of F.R.C.P. 8, Plaintiff has met this standard and in fact met this standard in his original Complaint. Nevertheless, Defendant

1   misconstrues this Court's October 15, 2010 order in an attempt to argue that Plaintiff has not

2   "cured" the pleading defects previously identified by this Court with respect to his claims under

3   18 U.S.C. § 1030.  Defendant argues that the prior pleading defects identified by this Court with

4   respect to his 18 U.S.C. § 1080 went to plausibility and that Plaintiff's allegations were simply

5   conclusory.  Motion to Dismiss at p. 14.  This is not the case.  Citing to p. 12, Doc. # 71,

6   Defendant argues that this Court previously held that Plaintiff's allegations of "'hacking' were

7   conclusory and that the Complaint was devoid of facts sufficient to support Flynn's 'hacking'

8   claims."  Motion to Dismiss at p. 14.  This Court's October 15, 2010 Order at Doc. # 71 stated

9   only that Plaintiff's claims under 18 U.S.C. § 1030 were conclusory with respect to his alleged

10  physical injury and this was the defect Plaintiff was given leave to cure.  Plaintiff has cured that

11  defect as described above.

12          Moreover, Plaintiff's First Amended Complaint more than satisfies F.R.C.P. 8 and the

13  "plausibility" standards set forth under *Twombley* and *Iqbal*.  Plaintiff details specifics of how

14  Montgomery gained unauthorized access into his computer and how Montgomery manipulated

15  electronic data in other computers to gain a litigation advantage against his opponents and further

16  how Defendant knowingly used this information to Plaintiff's prejudice.  See First Amended

17  Complaint at ¶¶ 22, 23, 24, 25, 26, 27, 29, 30.  The specific facts detailed in the First Amended

18  Complaint most certainly satisfy the "plausibility" standards under *Twombley* and *Iqbal* because

19  they provide detailed facts concerning the Defendant's aiding and abetting Montgomery's

20  violations of 18 US.C. § 1030 and most certainly provide more than a "formulaic recitation of the

21  elements of a cause of action", which *Iqbal* sought to do away with.  Thus, Plaintiff has satisfied

22  his burden under F.R.C.P. 8.

23          Despite Plaintiff satisfying his burden under F.R.C.P. 8, Defendant argues that the First

24  Amended Complaint is deficient because it does not provide specific dates and times when

25  Defendant aided and abetting Montgomery's violations of 18 U.S.C. § 1030.  This type of

26  specificity is why we have discovery and will come out in discovery.  Plaintiff should not be held

27  to a standard that the law does not impose.  As an initial matter, Plaintiff's First Amended

28  Complaint does detail the timeframe when the alleged computer hacking occurred.  See First

Amended Complaint at ¶¶ 12, 21, 22, 23, 24, 25, 26, 27, 29, 34 (describing how hacking occurred against Plaintiff beginning in June of 2007 and continuing through at least December of 2008).  In any event, Defendant's attack on the First Amended Complaint in this regard is a red herring.  By arguing that the First Amended Complaint is deficient merely because it is not as specific as Defendant would like as to the time and place of the 18 U.S.C. § 1030 violations, Defendant is attempting to impose on Plaintiff the higher pleading standard under F.R.C.P. 9 that is required when a plaintiff alleges fraud.  However, Defendant cites no authority for its argument that a cause of action under 18 U.S.C. § 1030 is subject to the heightened F.R.C.P. 9 pleading standard.  Thus, for the reasons discussed above, Plaintiff has satisfied his pleading requirements under F.R.C.P. 8.  Plaintiff has provided a wealth of specific facts which puts Defendant on notice of the basis for Plaintiff's claim against it under 18 U.S.C. § 1030.  If Defendant wants to challenge the factual allegations in the First Amended Complaint, its place to do so is in an Answer, not in its Motion to Dismiss which is what it has attempted to do.

     **C.**       **A Civil Claim for Aiding and Abbeting Violations of 18 U.S.C. § 1030 is Actionable**

Citing *Freeman v. DirectTV, Inc.*, 457 F.3d 1001 (9th Cir. 2006) and without providing any analysis, Defendant argues a claim for aiding and abetting a violation of 18 U.S.C. § 1030 is not actionable in a civil proceeding.  Defendant's reliance on *Freeman* is misplaced.  The holding in *Freeman* is limited to the 9th Circuit's interpretation of 18 U.S.C. § 2707, not § 1030.  In *Freeman*, the Ninth Circuit held that a civil litigant could not assert a conspiracy or aiding and abetting claim against a defendant because the provisions in 18 U.S.C. § 2707 contained no mention of imposing secondary liability on a class of persons who were not direct violators of 18 U.S.C. § 2707.  *Freeman*, 457 F.3d at 1006.  In arriving at this conclusion, the Ninth Circuit reasoned, "There is no explicit provision in §§ 2702 and 2707 or anywhere else in the ECPA, providing for secondary liability. Accordingly, it is reasonable to conclude that Congress knew what it was doing by not including such claims." *Id*.

It is evident that the Ninth Circuit's decision in *Freeman* is limited to and based upon the specific statutory provisions of 18 U.S.C. § 2707 and is not applicable, as urged by Defendant, to

1    18 U.S.C. § 1030.  In fact, the reasoning of *Freeman* actually supports Plaintiff's civil aiding and

2    abetting claim against Defendant for violating 18 U.S.C. § 1030.  Section 1030(b) provides that

3    "Whoever conspires to commit or attempts to commit an offense under subsection (a) of this

4    section shall be punished as provided in subsection (c) of this section."  18 U.S.C. § 1030(b).

5    Thus, unlike Section 2707, Congress specifically imposed secondary liability on those who

6    conspired and participated in violations of Section 1030.  Moreover, secondary liability under §

7    1030(b) for violations of § 1030(a) is not limited merely to criminal punishment but exposes the

8    secondary violator to civil liability as well.

9         In particular, § 1030(g) provides a civil remedy against a "violator" "of this section [i.e., §

10   1030 as a whole]."  18 U.S.C. § 1030(g).  Logically, because § 1030(b) provides that a person

11   who conspires to violate § 1030 is a "violator" of that section, then necessarily this secondary

12   violator is subject to civil liability under § 1030(g).

13        Thus, Defendant's argument that it cannot be subject to civil liability for aiding and

14   abetting Montgomery's violations of § 1030 is contrary not only to the reasoning of the Ninth

15   Circuit in *Freeman* but is also contrary to the plain language of the statute.

16   **3.**      **PLAINTIFF HAS ADEQUATELY ALLEGED A CAUSE OF ACTION FOR**

17             **AIDING AND ABETTING INVASION OF PRIVACY**

18        **A.**      **Defendant Attempts to Dismiss a Cause of Action that Plaintiff Did Not Plead**

19        In this Court's October 15, 2010 Order (Doc. # 71), this Court gave Plaintiff leave to

20   amend his Aiding and Abetting Invasion of Privacy cause of action against Defendant because

21   Plaintiff's original Complaint was lacking in sufficient factual detail.  As discussed above,

22   Plaintiff's First Amended Complaint cures this defect.  First Amended Complaint at ¶¶ 9, 10, 11,

23   12, 13, 14, 15, 16, 17, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33.

24        Nevertheless, Defendant now attempts defeat Plaintiff's Invasion of Privacy cause of

25   action by intentionally misstating Plaintiff's cause of action to fit it into a framework that would

26   allow Defendant to shield its wrongful conduct under the litigation privilege.  Contrary to

27   Defendant's assertion, Plaintiff is not asserting a cause of action for "public disclosure of private

28   facts" but for invading plaintiff's privacy, which is a separate tort from "public disclosure of

1   private facts."  See *People for Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 895 P.2d

2   1269, 1278-1285 (Nev. 1995) (distinguishing between these privacy related torts).

3          Under California law[4], a plaintiff states a cause of action for a violation of the State's

4   constitutional right to privacy if the plaintiff alleges three elements: (1) a legally protected

5   privacy interest, (2) a reasonable expectation of privacy under the circumstances, and (3) a

6   serious invasion of the privacy interest.  *Sheehan v. San Francisco 49ers, Ltd.*, 201 P.3d 472,477

7   (Cal. 2009).  This is the cause of action that Plaintiff has alleged in the First Amended Complaint.

8   Defendant has not argued in its Motion to Dismiss that Plaintiff's First Amended Complaint fails

9   to allege these three required elements.  Instead, Defendant's Motion to Dismiss pretends that

10  Plaintiff alleges a different cause of action for "public disclosure of private facts" and then argues

11  that it is shielded by the litigation privilege from any public disclosure of Plaintiff's private

12  information.  This argument by Defendant is wide of mark.  Under California law, no public

13  disclosure of private information is required to maintain a cause of action for violating a

14  plaintiff's privacy interests as it is not one of the three elements set forth by the California

15  Supreme Court in *Sheehan*.[5]  Thus, Defendant's argument that it is immune from liability for

16  invading Plaintiff's privacy based on the litigation privilege fails entirely as it is irrelevant to the

17  cause of action actually pled by Plaintiff.

18                **B.      Plaintiff Has an Expectation of Privacy in His Computer**

19         Notwithstanding Defendant's attempt to dismiss a cause of action that Plaintiff did not

20  plead, Defendant wrongfully argues that Plaintiff did not have a reasonable expectation of privacy

21  in his personal computer.

22         "Whether a legally recognized privacy interest is present in a given case is a question of

23  law to be decided by the court. [Citations.] Whether plaintiff has a reasonable expectation of

---

24  [4] This Court has already determined that California law should apply with respect to Plaintiff's
    common law and tort claims that led to the injuries he suffered.  See Doc. # 71, p. 15.

25  [5] To the extent that this Court might determine that Nevada law should apply to Plaintiff's

26  Invasion of Privacy cause of action, Nevada recognizes the counterpart to California's Invasion of
    Privacy tort and refers to it as loosely as "intrusion."  The elements for the tort of intrusion in

27  Nevada are substantially similar to those for its California analog.  See *People for Ethical
    Treatment of Animals*, 895 P.2d at 1279 ("To recover for the tort of intrusion, a plaintiff must

28  prove the following elements: 1) an intentional intrusion (physical or otherwise); 2) on the
    solitude or seclusion of another; 3) that would be highly offensive to a reasonable person."); *see
    also Kuhn v. Account Control Technology, Inc.*, 865 F.Supp. 1443, 1447 (D. Nev. 1994).

privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact.  If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law."  *Vo v. City of Garden Grove*, 115 Cal.App.4th 425, 447 (2004).  There can be no doubt that as a matter of law, Plaintiff has a legally recognized privacy interest in his personal computer.  *U.S. v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007) ("We hold that he also had a legitimate, objectively reasonable expectation of privacy in his personal computer.); see *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir.2004) ('Individuals generally possess a reasonable expectation of privacy in their home computers.'); *see also United States v. Buckner*, 473 F.3d 551, 554 n. 2 (4th Cir.2007) (recognizing a reasonable expectation of privacy in password-protected computer files); *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir.2001) (same)").

Even though Plaintiff as a matter of law has an expectation of privacy in his personal computer as alleged, Defendant attempts to defeat this legal hurdle by suggesting that Plaintiff lost that expectation of privacy once he learned that Montgomery was gaining unauthorized access to his computer.  Defendant's argument in this regard is the proverbial tail wagging the dog and if followed to its logical conclusion would mean that a plaintiff could never assert an invasion of privacy tort against a defendant once the plaintiff learns of the defendant's "hacking."

Moreover, Defendant argues that Plaintiff cannot state a claim for invasion of privacy by blaming Plaintiff for not doing enough to stop Montgomery from gaining unauthorized access to his personal computer.  By analogy, this is blaming the rape victim for being raped.  In any event, Defendant's argument in this regard is not proper on a motion to dismiss where factual challenges to the allegations have no place and all inferences are construed in the light most favorable to Plaintiff.  *Lee*, 250 F.3d at 688; *Wyler Summit P'ship*, 135 F.3d at 661.  The First Amended Complaint alleges, and this Court likely knows, that Dennis Montgomery has advanced computer skills and according to the U.S. Government, has conned the U.S. Government out of millions of dollars based on those skills.  Any efforts that Plaintiff might have undertaken to protect his privacy interests in his computer would likely have been futile to defeat Mr. Montgomery's

1   computer hacking efforts.  Moreover, for purposes of testing the sufficiency of pleadings,

2   Plaintiff need not detail every effort he made to protect his privacy interests, nor should he be

3   blamed for being the victim of Montgomery's and the Defendant's invasion of his privacy.

4          Indeed, what Defendant is really arguing is that Plaintiff has not satisfied the second

5   element of the tort of invasion of privacy (i.e., whether Plaintiff had a reasonable expectation of

6   privacy under the circumstances) and this is a mixed question of law and fact that might be proper

7   for determination on a motion for summary judgment after full discovery, but certainly not on a

8   motion to dismiss under Rule 12(b)(6).  See *City of Garden Grove*, 115 Cal.App.4th at 447.

9   Moreover, Defendant cites not authority for its proposition that Plaintiff must allege each and

10  every effort he undertook to protect the privacy in his computer.  Nowhere in Defendant's Motion

11  to Dismiss is there a case which states that as a matter of law a plaintiff must allege what steps the

12  plaintiff took to protect his or her passwords, what security software the plaintiff installed on his

13  or her computer, what efforts the plaintiff undertook while using public wifi networks, etc.  The

14  reason why Defendant cites no cases on this point is because there is no requirement that Plaintiff

15  allege that he did enough to prevent himself from being a victim of computer hacking on his own

16  personal computer.  These are factual issues that must be resolved through discovery and resolved

17  by a jury.

18         Finally, Plaintiff adequately alleges emotional and physical damages that he suffered in

19  the form of his flare up of shingles caused by the stress that was induced from Defendant's

20  wrongful conduct.  First Amended Complaint at ¶¶ 34, 39.  Defendant offers no legal support for

21  its position such damages for such injurious are not recoverable for Plaintiff's invasion of privacy

22  cause of action.  Because Defendant's conduct is not shielded by the litigation privilege, its

23  argument must fail.

24         **C.      Defendant Need Not Have an Independent Duty to be Liable Under an Aiding**

25                    **and Abetting Theory**

26         Defendant wrongfully argues that for it to be liable to Plaintiff under an aiding and

27  abetting theory, that it must owe Plaintiff an independent duty or have committed an actual tort

28  against Plaintiff.  This is not an accurate statement of the law by Defendant.  In fact, the

13

California courts have specifically rejected this theory advanced by Defendant and have stated that this theory is "unmeritorious." *Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th 1138, 1145 n. 2 (rejecting argument as unmeritorious that an aider and abettor must have an independent duty to the plaintiff to be liable to the plaintiff for aiding and abetting the person who committed the tort); *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1133 (C.D.Cal. 2003) ("No California case, however, holds that a party must owe the plaintiff a duty before he or she can be held liable as an aider and abettor. Rather, California cases outlining the elements of aiding and abetting liability have consistently cited the elements of the tort as they are set forth in the Restatement (Second) of Torts, § 876, and have omitted any reference to an independent duty on the part of the aider and abettor. Under this formulation, liability may properly be imposed on one who knows that another's conduct constitutes a breach of duty and substantially assists or encourages the breach.").

**D.** **Plaintiff Has Adequately Alleged Facts Supporting His Aiding and Abetting Claim**

Although Defendant cursorily claims that Plaintiff's First Amended Complaint is void of facts identifying how Defendant substantially assisted or encouraged Montgomery in invading Plaintiff's privacy, this argument ignores the facts enumerated in the First Amended Complaint. First Amended Complaint at ¶¶ 27, 28, 29, 30, 31, 32, 33. As an initial matter, when determining the sufficiency of a complaint alleging a civil aiding and abetting cause of action and whether the complaint satisfies the "substantial assistance" element of the claim, the courst focus on the defendant's knowledge of the specific primary wrong being committed against the plaintiff. *Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th at 1145. For example, "[i]n *Lomita Land Water Co. v. Robinson* (1908) 154 Cal. 36, 97 P. 10 (*Lomita*), the California Supreme Court explained this requirement in the course of affirming a judgment against two defendants for aiding and abetting a fraudulent land sale scheme engineered by two others. The court stated, 'The words 'aid and abet' as thus used have a well understood meaning, and may fairly be construed to imply an intentional participation with knowledge of the object to be attained.' Finding the defendants had 'actual knowledge of all the facts relative to' the scheme and

14

'knowingly' assisted in its 'consummation,' the court concluded they were rightly held liable for aiding and abetting the fraud.  *Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th at 1145-1146 (citations omitted).

Pursuant to his requirements under F.R.C.P. 8 and *Iqbal*, Plaintiff has sufficiently alleged facts to implicate Defendant's liability for aiding and abetting Montgomery's computer hacking. Plaintiff's First Amended Complaint alleges that Defendant's gained specific knowledge of Montgomery's computer hacking when Plaintiff repeatedly informed Defendant of this fact on repeated occasions.  First Amended Complaint at ¶¶ 17, 22, 27, 28, 29, 30, 31.  With knowledge of Montgomery's modus operandi to gain unauthorized access into the computers of his adversaries to gain litigation advantages, the First Amended Complaint then alleges that Defendant substantially assisted Montgomery in invading Plaintiff's privacy by using the information Montgomery gained in violation of Plaintiff's privacy in litigation against Plaintiff, thereby consummating the scheme and purpose of Montgomery's invasion of privacy.  First Amended Complaint at ¶¶ 17, 22, 27, 28, 29, 30, 31, 32, 33; *see also Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th at 1145-1146.[6]

## 4.   PLAINTIFF HAS ADEQUATELY ALLEGED CONSPIRACY CLAIMS AGAINST DEFENDANT

Plaintiff naturally recognizes that a civil conspiracy is not an independent cause of action but gives rise to legal remedies based on an underlying wrong.  *Hilton Hotels v. Butch Lewis Productions*, 862 P.2d 1207, 1210 (Nev.1993).  In arguing that Plaintiff has failed to adequately allege a conspiracy claim, Defendant again attempts to interject the "time, place or manner" pleading requirements of F.R.C.P. 9 that are necessary when a plaintiff alleges fraud.  See Motion to Dismiss at p. 26.  Again, Plaintiff's First Amended Complaint does not allege fraud and is therefore subject only to the "notice pleading" requirements of F.R.C.P. 8 which do not demand

---

[6] Defendant's argument that Plaintiff has not alleged sufficient facts to support the underlying tort of invasion of privacy (Motion to Dismiss at p. 24) is insufficient and consists all of one sentence. The First Amended Complaint adequately sets forth facts identifying that Plaintiff had a legally congnizable privacy interest in his computer, that Plaintiff had a reasonable expectation of privacy in his computer under the circumstances and that Montgomery committed a serious invasion of that interest when he repeatedly and surreptitiously invaded that interest by hacking into Plaintiff's computer.  First Amended Complaint at ¶¶ 9, 10, 15, 17, 20-34, 38,

1   detailed factual allegations.  *Iqbal*, 129 S. Ct. at 1949.  And in testing the legally sufficiency of

2   Plaintiff's First Amended Complaint, this Court must "presume that general allegations embrace

3   those specific facts . . . necessary to support the claim." *Canyon County*, 519 F.3d at 982.  Here,

4   the First Amended Complaint alleges in sufficient detail that Defendant knowingly used

5   information that Montgomery gained by hacking into Plaintiff's computer (which constituted a

6   violation of 18 U.S.C. § 1030 and the tort of invasion of privacy) for the purpose of harassing and

7   intimidating Plaintiff in litigation.  First Amended Complaint at ¶¶ 9, 10, 11, 12, 13, 14, 15, 16,

8   17, 25, 26, 27, 28-34, 56, 57, 58.  These detailed factual allegations show the existence of an

9   agreement between Defendant and Montgomery to improperly harass and intimidate Plaintiff into

10  submission by employing scorched earth litigation tactics.  As this Court likely knows, Defendant

11  did engage in and its attorneys were sanctioned for this improper conduct.  See Docket No. 985,

12  Case No. 3:06-cv-56.  Moreover, the First Amended Complaint alleges, and this Court must

13  presume that Defendant knew that to further this unlawful objective, Montgomery was invading

14  Plaintiff's privacy and violating 18 U.S.C. § 1030 by hacking into Plaintiff's private computer.

15          Thus, Plaintiff has adequately alleged the required elements of a civil conspiracy for

16  purposes of Rule 12(b)(6).

17  **5.      PLAINTIFF HAS ALLEGED A CIVIL RICO CLAIM AGAINST DEFENDANT**

18          **A.      Plaintiff Has Suffered Injury to His Business or Property**

19          Defendant argues that Plaintiff has not suffered an injury to his business and therefore

20  cannot state a RICO claim.  Motion to Dismiss at 12.  While Plaintiff acknowledges that this

21  Court previously denied Plaintiff the ability to collect from Defendant the $600k owed to Plaintiff

22  by Montgomery because Plaintiff has an uncollectable judgment against Montgomery for that

23  amount, Defendant ignores the allegations in the First Amended Complaint that Plaintiff has a

24  total of $1,030,000 in unpaid legal fees owed to him and incurred by him as a result of

25  Montgomery's and Defendants' RICO violations.  See First Amended Complaint § 50, 54.  Thus,

26  exclusive of the $600k judgment, Plaintiff continues to have damages in the form of incurred

27  legal fees in the amount of $430,000.

28          Additionally, without citing any authority, Defendant argues that unpaid and/or previously

1    incurred legal fees suffered by a plaintiff as a result of RICO conduct is not an injury to business

2    or property within the meaning of 18 U.S.C. § 1964(c).  According to Defendant, therefore,

3    Plaintiff as a matter of law cannot state a civil RICO claim against Defendant based on the

4    $430,000 that Plaintiff incurred to defendant himself against Defendant and Montgomery's RICO

5    violations.  Motion to Dismiss at p. 12.  Defendant's position in this regard is contrary to law.

6            In *Burger v. Kuimelis*, 325 F.Supp.2d 1026 (N.D.Cal. 2004), the court was confronted

7    with this very issue and found that prior legal expenses incurred by a RICO plaintiff as a result of

8    the RICO conduct did constitute injury to business under § 1964(c).  The *Burger* court reasoned:

9            Although no controlling Ninth Circuit precedent appears to exist,
10           other circuits have held that prior legal expenses are cognizable
             under RICO.  See, e.g., *Handeen v. Lemaire*, 112 F.3d 1339, 1354
11           (8th Cir.1997) (holding that prior legal expense "qualifies as an
             injury to business or property that was proximately caused by a
12           predicate act of racketeering");  *Stochastic Decisions, Inc. v.
             DiDomenico*, 995 F.2d 1158, 1166-67 (2d Cir.1993) ("[L]egal fees
13           may constitute RICO damages when they are proximately caused
             by a RICO violation.").  The court finds the reasoning of these
14           cases persuasive. Legal expenses are concrete financial losses, "not
             mere injury to a valuable intangible property interest" and are thus
15           recoverable under RICO.  See *Chaset v. Fleer/Skybox Int'l, LP*, 300
             F.3d 1083, 1086-87 (9th Cir.2002).
16

17           *Burger*, 325 F.Supp.2d at 1035 (N.D.Cal. 2004); *see also Lauter v. Anoufrieva*, 642

18   F.Supp.2d 1060, 1085 n. 33 (C.D. Cal. 2009) (same).  Based on the reasoning of *Burger* and the

19   law within other Circuits cited therein, Defendant's argument rings hollow.

20           **B.     Defendant's RICO Conduct was the Direct Cause of Plaintiff's Injury**

21           Defendant argues that Plaintiff's RICO cause of action must be dismissed because there is

22   purportedly no direct causation between Defendant's bank fraud and Plaintiff's harm.  Motion to

23   Dismiss at pp. 10-11 (for example "individual and institutional lenders were the victims of the

24   alleged scheme to obtain fraudulent loans").  Plaintiff's allegations regarding Defendant's

25   participation in defrauding banks establishes one of the predicate acts that Defendant committed

26   in furtherance of the RICO scheme.  However, contrary to what Defendant argues, a civil RICO

27   plaintiff does not need to be the direct victim of each predicate act, the plaintiff need only be the

28   direct victim of the RICO scheme.

After showing that the plaintiff has sufficiently alleged an "injury to business or property," a plaintiff must next show that the injury was proximately caused by the RICO scheme. *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992). "Proximate cause" only requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id*. However, "the term "proximate cause" does not easily lend itself to definition." *McBride v. CSX Transp., Inc.*, 598 F.3d 388 (7th Cir. 2010). Indeed, with respect to the concept of proximate cause, one noted commentator has stated:

> There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion. Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement to the best approach.

W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 41 at 263 (5th ed. 1984). See *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 175 L. Ed. 2d 943, 2010 WL 246151, *5 (2010) (stating that "[p]roximate cause for RICO purposes . . . should be evaluated in light of its common law foundations" and "requires some direct relation between the injury asserted and the injurious conduct alleged"). Under the "common-law foundations" of proximate cause, the *Hemi* court merely applied the standard requirement that there be some direct relation between the injury and the conduct. Thus, there is liability for both "all 'direct' (or 'directly traceable') consequences and those indirect consequences that are foreseeable." Prosser and Keeton § 42, at 273; see also id., § 43, at 294, and n. 17. The concepts of direct relationship and foreseeability are not mutually exclusive, but instead "two of the many shapes proximate cause took at common law." *Hemi*, 139 S.Ct at 14.

The Supreme Court has addressed civil RICO's causation requirements in three key cases, *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992), *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 453, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006) and the Supreme Court's recent decision, *Hemi Group v. City of New York*, 2010 U.S. LEXIS 768 (U.S., Jan. 25, 2010).

In *Holmes*, the Court focused on § 1964(c)'s requirement that the claimed injury be "by reason of a defendant's RICO violation." See 18 U.S.C. § 1964(c). In that case, after losses due

1   to a stock manipulation scheme caused two broker-dealers to fail, the Securities Investor

2   Protection Corporation ("SIPC") had to pay over $13 million in claims to customers of the

3   broker-dealers after the broker-dealers were unable to meet their obligations to its customers.

4   SIPC sued the defendants pursuant to RICO, claiming that because of the fraudulent stock

5   manipulation scheme, SIPC had to pay customers of the failed broker-dealers.  Significantly,

6   SIPC was not bringing the action on behalf of customers of the broker-dealers that had lost

7   money in the stock scheme.

8        Rejecting SIPC's claim as lacking proximate cause, the Court held that a plaintiff must be

9   able to show that the violation was not only the 'but for" cause of the injury, but also the

10  proximate cause, which "demand[s] for some direct relation between the injury asserted and

11  injurious conduct alleged."  *Id*. at 268.  The *Holmes* Court noted the following three policy

12  reasons for requiring proximate causation in the RICO context: (1) the factual difficulty of

13  measuring indirect damages and distinguishing among distinct independent causal factors; (2) the

14  complexity of apportioning damages among plaintiffs "to obviate the risk of multiple recoveries";

15  and (3) the fact that "the need to grapple with these problems is simply unjustified by the general

16  interest in deterring injurious conduct, since directly injured victims can generally be counted on

17  to vindicate the law."  *Id*. at 269.  The alleged harm was SIPC's payment of claims to customers

18  of the failed broker-dealers.  The RICO conduct, however, was the stock manipulation scheme.

19  Thus, any harm befalling the customers was caused by the failure of the broker-dealers, not the

20  loss of money from the stock manipulation scheme.  The Court then held that the injury in

21  Holmes was too remote to allow recovery because it was contingent upon the harm to another.

22  *Id*. at 271 74.

23       In *Anza*, 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed. 2d 720, the Supreme Court found no

24  proximate cause where, although the plaintiff's injury was not derivative as it was in *Holmes*, but

25  it was nevertheless too remote to allow recovery.  In *Anza*, a merchant sued its competitor under

26  RICO alleging that it was injured because the competitor failed to charge sales tax and submitted

27  fraudulent tax returns and, thus, was able to undercut plaintiff's price.  *Id*. at 453-56.  In finding

28  that the plaintiff had inadequately alleged proximate causation, the Court explained that "[t]he

19

1   cause of [the plaintiff's] asserted harms is a set of actions (offering lower prices) entirely distinct

2   from the alleged RICO violation (defrauding the State)." *Id*. at 458.  The alleged RICO violation

3   directly caused the State to be defrauded of taxes, not the plaintiff to lose money to its competitor.

4   *Id*.

5          The Supreme Court's most recent pronouncement on proximate cause in the civil RICO

6   context is found in *Hemi*.  That case involved a city tax on those who possess cigarettes.  *Id*. at

7   986.  In state sellers were required to collect the tax from purchasers and pay it to the city but out

8   of state sellers were not.  *Id*. at 987.  Instead, the city was responsible for recovering the tax

9   directly from the purchasers.  *Id*.  The city required out of state sellers to register and file a report

10   with the state listing the name and address of the in state purchasers.  *Id*.  The city used the report

11   to track down cigarette buyers who had not paid their possession taxes.

12          The defendant in *Hemi* was an out of state cigarette seller who sold cigarettes to

13   purchasers online but did not file the required reports with the state.  *Id*.  The city filed suit

14   against the defendant, alleging that its failure to file the reports constituted the RICO predicate

15   offense of mail fraud.  *Id*.  It asserted its injury was "lost tax revenues."  *Id*. at 987 88.  The

16   Supreme Court determined that the city could not establish the causation required under RICO

17   because it could not establish it had suffered the injury "by reason of" the alleged fraud as

18   required by § 1964(c).  *Id*. at 988.

19          "The conduct directly responsible for the City's harm was the customers' failure to pay

20   their taxes.  And the conduct constituting the alleged fraud was [the defendant's] failure to file. . .

21   reports."  *Id*. at 990.  Accordingly, "the conduct directly causing the harm was distinct from the

22   conduct giving rise to the fraud."  *Id*.  Instead, a plaintiff must show that the fraudulent conduct

23   led directly to the plaintiff's injuries.  *Id*. at 992.  Because the city's injuries "were not caused

24   directly by the alleged fraud," the injuries were not caused "by reason of" the fraud.  Thus, the

25   RICO claim failed.  *Id*. at 994.

26          Here, Plaintiff's injuries were caused directly and in fact were the object of the

27   Defendant's RICO scheme of harassing and intimidating Plaintiff to deny him legal fees to which

28   he was entitled and to silence him so that he would not expose their fraud on the U.S.

Government.  As alleged in the First Amended Complaint (¶¶ 43-49), Plaintiff was the target of Defendant's scheme, and Defendant funded this scheme through the predicate acts of defrauding banks and lenders.  This is not the type of "attenuated" or "remote" chain of causation that the Supreme Court in *Hemi* or *Holmes* has found to defeat a civil RICO claim.  The conduct directly responsible for Plaintiff's harm was Defendant participating in defrauding banks and lenders because only through defrauding bank and lenders could Defendant fund its scheme against Plaintiff.  Unlike in *Anza* or *Hemi* where the Supreme Court was concerned about nebulous and multi-step causation analyses (policy (1) identified in *Holmes*, *supra*), there is a direct, one-step link in the chain of causation between Defendant obtaining fraudulent proceeds, and then using those loan proceeds to fund its harassment and intimidation scheme against Plaintiff.  Moreover, the concern of the Supreme Court in *Holmes* regarding apportioning damages amongst an endless sea of plaintiffs (policy (2) indentified in *Holmes*, *supra*) is not present.  The universe of plaintiffs is limited to Mr. Flynn and his damages are concretely identifiable as he was the sole target of Defendant's RICO scheme.

In short, Plaintiff has suffered damages that are directly attributable to Defendant's RICO scheme and were caused in fact and intended to be caused through Defendant defrauding banks and lenders as alleged in the First Amended Complaint.

Defendant nevertheless argues that Plaintiff cannot state a RICO claim on the facts alleged because all the loans that were fraudulently obtained were procured after the harassment of Plaintiff in Massachusetts and in California.  Thus, according to Defendant, how could Plaintiff have been harmed by Defendant's fraudulent bank loans when those loans were procured after it engaged in the litigation conduct against Plaintiff.  Motion to Dismiss at pp. 10-11.  This specious argument ignores the facts alleged in the First Amended Complaint and the litigation that has occurred before this Court in the eTreppid case.

As the Complaint alleges and as this Court knows, Defendant represented Montgomery and Edra Blixseth in the "eTreppid case" (Order at p. 2, Docket No. 71) which is also pending before this Court as Case No. 3:06-cv-00422 and it was within this context that Defendant engaged in the alleged wrongful conduct from the summer and fall of 2007 through the fall of

2008.  In the eTreppid case, Defendant, through its employees and partner attorneys, engaged in a

pattern of conduct to harass and intimidate Plaintiff culminating in March 3, 3009 when this

Court issued a Sanctions Order in the eTreppid case in which it stated:

> The court concludes that the animosity Mr. Montgomery and Ms.
> Blixseth harbored for Mr. Flynn would never be paid and to <u>crush</u>
> <u>him into submission in the process</u>.  By her conduct as lead counsel
> in these proceedings, Ms. Klar allowed her clients to involve the
> Liner firm, Ms. Pham and herself in a scheme to exploit legitimate
> legal proceedings to harass and punish Mr. Flynn.  Ms. Klar crossed
> over the line as a zealous advocate for her clients' interests and
> abdicated her ethical and professional duties to the court in
> advancing this strategy.  (Case No. 3:06-cv-00422, Docket No. 985
> at pp. 45-46) (emphasis added).

> . . .

> Ms. Klar was allowed to operate in the Liner firm unchecked and
> unquestioned, and this conclusion is supported by her pattern of
> sanctionable conduct that ensued <u>long after the fall of 2007</u>.  It was
> not <u>until matters came to a head in the summer of 2008</u> that senior
> partners finally stepped in to this case.  The court finds that the
> Liner firm acquiesced to or willingly carried out Ms. Klar's
> litigation strategy; therefore sanctions against the Liner firm are
> warranted pursuant to 28 U.S.C. § 1927.  (*Id*. at p. 48) (emphasis
> added).

> . . .

> <u>In July 2008</u>, senior partners in the Liner firm finally stepped into
> this case, but this was only after several sanction orders had been
> issued, and both Ms. Klar and Mr. Montgomery were facing very
> serious allegations unrelated to the issues currently before this
> court.  It was also months after Ms. Klar's unsuccessful campaign
> to divest this court of jurisdiction and to defeat Mr. Flynn at any
> cost.  (*Id*. at p. 50.).

Consistent with the Sanctions Order, which this Court may consider in ruling on

Defendant's Motion to Dismiss, Plaintiff's First Amended Complaint (¶¶ 34, 39), alleges that the

harassment engaged in by Defendant continued throughout 2007 and 2008 because the stress of

this on-going harassment manifested itself when Plaintiff suffered his debilitating case of shingles

from October to December of 2008.  Thus, the fraudulent loan proceeds that Defendant received

during this time period were being used to continue the harassment and intimidation of Plaintiff

as alleged.  Moreover, the Sanctions Order recognizes that the Defendant's harassment and intimidation of Plaintiff occurred up until at least July of 2008 when the senior partners of Defendant finally realized that they had allowed Ms. Klar and Ms. Pham to operate "unchecked" for far too long.  Again, this harassment was funded by the fraudulent loan proceeds that Defendant was procuring for Edra Blixseth during this time period.  Most specifically, the First Amended Complaint alleges that in November and December of 2007, Defendant assisted Edra Blixseth in receiving $9.5 million in fraudulent loan proceeds from American Bank.  First Amended Complaint at ¶ 47.  This is the critical time in which Defendant engaged in the specifically identified wrongful conduct of filing bar complaints in California and Massachusetts, filing knowingly perjured declarations, initiating arbitration proceedings in San Diego, and seeking two writs of possession in California state court.  Assuming the truth of the allegations in the First Amended Complaint and assuming all facts exist to support the allegations and inferences in the First Amended Complaint, it is appropriate to view all the fraudulent loan proceeds identified in the First Amended Complaint as necessary to pay Defendant for all concurrently incurred and delinquent legal bills owed to Defendant for its legal services rendered on behalf of Montgomery and Edra Blixseth beginning in the fall of 2007 and continuing until March of 2009 when this Court finally and appropriately sanctioned Defendant for its harassment and intimidation of Plaintiff.  In other words, Defendant billed Montgomery and Edra Blixseth for the harassment of Plaintiff then got paid for it by means of the fraud on banks and lenders as alleged in the First Amended Complaint.

Plainly then, there is a direct causational link between Plaintiff's injury and Defendant's RICO conduct.

**6.     PLAINTIFF CAN ADD NEW CLAIMS OR SHOULD BE GIVEN NUNC PRO TUNC LEAVE TO AMEND TO DO SO**

The Liner firm argues that Plaintiff cannot add new claims under RICO and 18 U.S.C. § 2707 because such claims fall outside the scope of this Court's October 15, 2010 Order.  See Liner Motion to Dismiss at 8, Doc. 86.  In support of this proposition, the Liner firm cites only an unpublished case from the Southern District of California (*Mat-Van, Inc. v. Sheldon Good & Co.*

*Auctions, LLC*, 2008 WL 346421) that is void of any legal analysis on this issue.  This Court's

October 15, 2010 Order did not limit Plaintiff's ability to amend his Complaint to add new claims

or causes of action.  Nevertheless, Plaintiff will concurrently file a motion seeking leave to amend

his Complaint *nun pro tunc* to add his RICO claim.  In light of the liberal policy in favor of

allowing amendments to pleadings and because this case has not yet advanced beyond the

pleading stage, this Court ought to grant Plaintiff such relief as Defendants will suffer no

prejudice.

> CONCLUSION

> Defendants' motion to dismiss should be denied.

Dated  this 2nd day of February, 2011.

_____
Peter Chase Neumann
136 Ridge Street, Reno, NV 89501
Co-Counsel for Plaintiff

CERTIFICATE OF SERVICE  ON OPPOSING COUNSEL

> Pursuant to FRCP 5(b), I certify that I am Peter C. Neumann, co-counsel for plaintiff

Michael J. Flynn, and that on this 2nd day of February, 2011, I caused to be served a true and

correct copy of the foregoing RESPONSE IN OPPOSITION TO MOTION TO DISMISS FIRST

AMENDED COMPLAINT by means of  filing with the PACER Electronic E-Service System,

upon all counsel who have appeared herein, including David Grundy, Alice Campos Mercado at

Lemons, Grundy & Eisenbert, 6005 Plumas Street, Reno, NV 89519 (attorneys for defendants

Klar and Pham),  and Daniel T. Hayward, Laxalt & Nomura, 9600 Gateway Drive, Reno, NV

89521, (attorneys for defendant Liner, Grode, Yankelevitz, Sunshine, Regenstreif & Taylor,

LLP).

_____
Peter C. Neumann