1  Eric A. Pulver, Nevada State Bar No. 07874
   Logar Pulver 1875 Plumas Street, Suite 1
2  Reno, NV 89509
   Tel.: 775 786 5040;
3  Fax: 775 786 7544
   E-mail: eric@logarpulver.com
4
   Peter Chase Neumann, Nevada Bar No. 00636
5  136 Ridge Street
   Reno, NV 89501
6  Tel.: 775 786 3750
   Fax.: 775 786 7544
7  E-mail: petercneumann@sbcglobal.net

8                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
9

10     MICHAEL J. FLYNN,                    3:09-CV-00422-PMP-RAM

11              Plaintiff

                                            RESPONSE IN OPPOSITION TO MOTION TO
12         vs.                              DISMISS FIRST AMENDED COMPLAINT

13     LINER GRODE STEIN YANKELEVITZ        **HEARING REQUESTED**
       SUNSHINE REGENSTREIF & TAYLOR
14     LLP, DEBORAH A. KLAR, and TERI
       PHAM,

15              Defendants

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, Michael J. Flynn, by and through his undersigned counsel, hereby submits this Response in opposition to the Defendants Pham's and Klar's Motion to Dismiss.  Mr. Flynn also requests that this Court conduct a hearing on Defendants' Motion to Dismiss.

## 1.   BACKGROUND

Plaintiff's instant lawsuit against Defendants has its genesis in Montgomery v. eTreppid Technologies, et al, Case No. 3:06-cv-00056, U.S. District Court, District of Nevada (hereinafter the "eTreppid case")[1] and is the unfortunate result of "scorched earth litigation" strategies employed by attorneys Pham and Klar to "crush [Plaintiff] into submission" and "to exploit legitimate legal proceedings to harass and punish Mr. Flynn."  See Sanctions Order at pp. 45-46. In the eTreppid case, this Court found that attorneys Pham and Klar repeatedly and knowingly participated and facilitated the fraud that Dennis Montgomery was perpetrating on this Court and in various tribunals in California and Massachusetts.  This Court even found that attorney Klar repeatedly engaged in conduct designed to intentionally harm Plaintiff.  Sanctions Order at p. 45 ("crush him into submission").  All of the facts concerning the acts of oppression that Defendants Pham and Klar participated in are detailed in this Court's 54-page Sanctions Order.  While there are a plethora of facts outlined in the Sanctions Order, Judge Cooke condensed and summarized those facts in the following excerpts:

> Apart from the litigation misconduct and contempt of this court described above, there is another very <u>disturbing subtext</u> about what occurred.  It is evident that when Mr. Flynn and Mr. Montgomery parted company in July 2007, there was tremendous animosity between the two . . . .  By her conduct as lead counsel in these proceedings, Ms. Klar allowed her clients to involve the Liner firm, Ms. Pham and herself in a scheme to <u>exploit legitimate legal proceedings to harass and punish Mr. Flynn</u>.  Ms. Klar crossed over the line as a zealous advocate for her clients' interests and abdicated

---

[1] In ruling on Defendant's Motion to Dismiss, Mr. Flynn requests that this Court take judicial notice of the Sanctions Order at Docket No. 985, Case No. 3:06-cv-00056 ("eTreppid case") and the proceedings within the eTreppid case and the other documents within the eTreppid case which are specifically referenced herein.  In ruling on a motion to dismiss under Rule 12(b)(6), a court may consider matters of which the court could take judicial notice.  *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988) ("In addition to the complaint, it is proper for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss.").  Courts may take judicial notice of court filings and other matters of public record.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006).

1

2

her ethical and professional duties to the court in advancing this strategy.  (Case No. 3:06-cv-00422, Docket No. 985 at pp. 45-46) (emphasis added).

3

. . .

4

5

6

7

8

9

Ms. Klar was allowed to operate in the Liner firm unchecked and unquestioned, and this conclusion is supported by her pattern of sanctionable conduct that ensued <u>long after the fall of 2007</u>.  It was not <u>until matters came to a head in the summer of 2008</u> that senior partners finally stepped in to this case.  The court finds that the Liner firm acquiesced to or willingly carried out Ms. Klar's litigation strategy; therefore sanctions against the Liner firm are warranted pursuant to 28 U.S.C. § 1927.  (*Id.* at p. 48) (emphasis added).

10

This Court previously recognized in the Sanctions Order that there exists a "disturbing

11

subtext" in the litigation conduct of Defendants against Mr. Flynn.  This subtext included

12

Defendant Ms. Klar engaging in a "consistent pattern of gamesmanship, misrepresentations, and

13

outright contempt" in her "unrelenting . . . campaign to achieve her desired end . . . and she was

14

willing to do so at any cost . . . to Mr. Flynn."  Defendant Pham was equally involved in this

15

"disturbing subtext."  See e.g., Sanctions Order at p. 43 ("Ms. Pham, under the supervision of Ms.

16

Klar, engaged in a consistent pattern of material misrepresentations and the omissions of material

17

facts from her court papers, oral arguments, and bar complaints.  Conveying half truths and only

18

part of the record in matters is a misrepresentation and a breach of her ethical duties as a lawyer .

19

. . . Even after this court's definitive October 12, 2007 orders, Ms. Pham went in to California

20

Superior Court and intentionally misrepresented the import of this court's orders."); see also

21

Docket 1098 in eTreppid case.

22

It is within this "disturbing subtext" that this Court must view the allegations of Plaintiff's

23

First Amended Complaint (hereinafter "**FAC**").  When viewed within this "disturbing subtext",

24

Plaintiff's allegations of Defendants' knowing participation in Montgomery's computer hacking

25

are not only "plausible" for purposes of *Twombley, Iqbal*, and F.R.C.P. 8, but they are wholly

26

consistent with and provide a full picture of the "unrelenting" "campaign" of litigation war that

27

Defendants Pham and Klar waged "at any cost" against Plaintiff and which should not be

28

suppressed with a motion to dismiss, particularly where sufficient facts are alleged.  The litigation

1   privilege surely does not permit an attorney to do whatever they want, even engage in criminal

2   conduct, and then hide behind the litigation privilege, as Defendants are trying to do.  Indeed, a

3   similar situation arose in the case *Leor Exploration & Production, LLC v. Aguiar*, Case Nos. Nos.

4   09-60136, 09-60683, 2010 WL 3782195 (S.D.Fla., September 28, 2010), where a district court

5   judge imposed sanctions on a party who had a "win-at-all-costs attitude" with regard to the

6   litigation and employed computer hacking against his adversaries as one method of implementing

7   his win at all costs strategy.  *Leor Exploration & Production,* 2010 WL 3782195 at **2-12.

8          Similarly here, Defendants engaged in an unrelenting litigation war against Plaintiff which

9   has caused him significant harm, not only monetarily, but also physically.  Plaintiff's FAC

10  describes the rest of the story that this Court was not aware of when it issued the Sanctions Order.

11  The rest of the story as detailed in the FAC, explains how Ms. Klar and Ms. Pham engaged in a

12  full scale litigation war against Plaintiff that involved their knowing participation in computer

13  hacking and obtaining fraudulent loans for the purpose of fully executing their winning "at any

14  cost" strategy against Plaintiff that they engaged in to "harass and punish Mr. Flynn."

15         As detailed in Mr. Flynn's Motion for Sanctions filed in the eTreppid case at Docket No.

16  545 and supporting documents, the purpose of the litigation war that Defendants waged against

17  Mr. Flynn was to "harass and punish Mr. Flynn" because Mr. Flynn had realized that the

18  Defendants' clients, Edra Blixseth and Dennis Montgomery, were perpetrating a fraud on the U.S.

19  Government by trying to obtain a $100 million black budget contract based on non-existent, if not

20  phony, terrorist detecting software.  In fact, the New York Times just exposed this fraud on the

21  U.S. Government.  See **Exhibit 1**.

22         Through its filings in the eTreppid case, the U.S. government showed that Montgomery

23  and Edra Blisxeth's alleged terrorist detecting technology and source code was non-existent, if

24  not fraudulent, and Pham and Klar knew this, but rather than withdraw, they maliciously went

25  after Mr. Flynn and protected the frauds of their clients, Montgomery and Blixseth.  Defendants

26  Pham and Klar were faced with the same decision that Mr. Flynn was faced with when he

27  discovered the fraud; Defendants Pham and Klar had to decide whether to withdraw from their

28  representation of Edra and Montgomery for ethical and professional reasons, or "double-down"

1   by compounding Edra and Montgomery's fraud with their own fraudulent conduct pursued for the

2   purpose of winning the proverbial pot of gold at the end of the rainbow, which was the $100

3   million "black budget" contract.  Unfortunately, Defendants chose to "double-down" and in doing

4   so "crossed over the line as [] zealous advocate[s] for [their] clients' interests and abdicated

5   [their] ethical and professional duties . . . " Sanctions Order at p. 46.  When Pham and Klar

6   decided to facilitate the fraudulent scheme of Edra and Montgomery, their only course was to

7   beat Plaintiff into "submission" to silence and prevent him from exposing Edra and

8   Montgomery's fraud because only through silencing Plaintiff could Edra and Montgomery be

9   awarded their $100 million "black budget" contract.

10          Therefore, to fund this silencing of Plaintiff, Defendants committed numerous acts of

11   bank and lending fraud when they facilitated and arranged for Edra Blixseth to obtain over $50

12   million in loan proceeds based on knowingly false financial statements.  As alleged in the FAC (¶

13   45), Defendants introduced Wachovia to Edra Blixseth as a lender then represented Edra in her

14   loan transaction with Wachovia and in doing so, helped Wachovia secure its $8 million loan to

15   Edra based on the terrorist detecting technology that Defendant knew was phony.  Those loan

16   proceeds were then used to fund the "consistent pattern of gamesmanship, misrepresentations,

17   and outright contempt" (Sanctions Order at p. 37) that Defendants employed before this Court

18   against Plaintiff.

19          As alleged in the FAC, Defendants also knowingly participated in the computer hacking

20   that it knew Montgomery was engaging in against his litigation adversaries.  Again, having

21   decided to "double-down" and participate and compound the fraud of Edra and Montgomery,

22   Defendants engaged in a "total war" litigation campaign against Plaintiff to beat him into

23   submission.  In fact, Defendants had no choice but to "win at all costs" once they decided to

24   continue their representation of Edra and Montgomery because to lose in any regard would

25   necessarily expose Defendants' knowing participation in a $100 million fraud on the U.S.

26   Government.  Given the documented and adjudicated vexatious litigation conduct of Defendants,

27   and that the averments in the FAC meet the pleading requirements, it would be error to dismiss

28   the FAC.

1

2   **2.      STANDARD FOR TESTING THE SUFFICIENCY OF PLEADINGS UNDER**

3   **F.R.C.P. 12(B)(6)**

4   A complaint is sufficient where it merely alleges facts which, if true, would provide

5   adequate grounds for the plaintiff's entitlement to relief.  *Bell Atlantic Corp. v. Twombly*, 550

6   U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  "There is a strong presumption against

7   dismissing an action for failure to state a claim."  *Plum Creek Timber Co., Inc. v. Trout*

8   *Unlimited*, 255 F.Supp.2d 1159, 1162 (D. Idaho 2003).  In considering a motion to dismiss

9   pursuant to Rule 12(b)(6), "all well-pleaded allegations of material fact are taken as true and

10   construed in a light most favorable to the non-moving party."  *Wyler Summit P'ship v. Turner*

11   *Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir.1998) (citation omitted).  The Supreme Court,

12   expanding on *Twombly*, held as follows in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009):

13   [T]he pleading standard [under Fed. R. Civ. P.] 8 does not require "detailed factual

14   allegations, but it demands more than an unadorned, the defendant unlawfully harmed me

15   accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the

16   elements of a cause of action will not do."  Nor does a complaint suffice if it tenders "naked

17   assertion[s]" devoid of further factual enhancement.

18   Where a complaint contains sufficient factual matters which, if accepted as true, "state[s]

19   a claim to relief that is plausible on its face," the complaint will survive a motion to dismiss.  *Id*.

20   (citing *Twombly*, 550 U.S. at 570).  For a claim to have facial plausibility, the plaintiff must plead

21   facts that allow the court to reasonably infer that the defendant is liable for that which is alleged.

22   *Id*. (citing *Twombly*, 550 U.S. at 556).  In evaluating a complaint's adequacy at the motion to

23   dismiss stage, a court must "presume that general allegations embrace those specific facts . . .

24   necessary to support the claim." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 982 (9th

25   Cir. 2008) (citing *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004)).

26

27

28

3. **PLAINTIFF HAS STATED A CLAIM UNDER 18 U.S.C. § 1030 AGAINST THE LINER FIRM**

   A. **Plaintiff Has Properly Alleged Actionable Damages Against Defendants Under 18 U.S.C. § 1030**

   In this Court's October 15, 2010 Order, it stated that Plaintiff's claim against Defendants under 18 U.S.C. § 1030 was deficient because it did not sufficiently describe the physical injury suffered by Plaintiff as a result of Defendants violations of § 1030.  See Order at Doc. # 71, p. 12. Defendants Pham and Klar complain in their motion to dismiss that Plaintiff's FAC fails to cure this defect.  See Motion to Dismiss, Docket No. 90 at pp. 12-13.  They are wrong.

   Plaintiff has cured this defect with his FAC.  See FAC at ¶¶ 34, 39.  18 U.S.C. § 1030(g) allows a civil litigant to maintain an action against any person who violates the provisions of Section 1030 where the plaintiff has suffered one of the enumerated categories of damages set forth in subclauses (I)-(V) of 18 U.S.C. § 1030 (c)(4)(A)(i).  In turn, 18 U.S.C. § 1030(c)(4)(A)(i)(III) provides "physical injury to any person" as an enumerated category of damages for a violation of Section 1030(a).  Plaintiff's FAC chronicles in detail the specific physical injury suffered by Plaintiff as a result of Defendants' violations of Section 1030(a).  In particular, Plaintiff details how he suffered from a debilitating case of shingles between October and December of 2008, the onset of which was caused from the stress of knowing that Defendants were conspiring with Montgomery to gain unauthorized access into Plaintiff's computers and use information gained from that unauthorized access to harass and intimidate Plaintiff.  See FAC at ¶¶ 34, 39.

   Thus, on the face of the FAC, Plaintiff has adequately alleged that he suffered a compensable physical injury under 18 U.S.C. § 1030(g).  Accordingly, Defendants' argument that Plaintiff's allegations are merely "conclusory allegations devoid of facts" rings hollow and is contrary to the details Plaintiff has alleged and what is required under F.R.C.P. 8.

   Moreover, Defendants argue that Plaintiff's allegation of suffering from shingles as a result of its conspiracy to violate 18 U.S.C. § 1030 is deficient because Plaintiff does not explain "how the computer hacking caused him the alleged physically injury, which he now identifies as

shingles." Motion to Dismiss at p. 13. This argument is unavailing. The FAC makes clear that the stress suffered by Plaintiff as a result of Montgomery's <u>on-going</u> computer hacking and Defendants' involvement therein resulted in Plaintiff suffering from a debilitating case of shingles between October and December of 2008. FAC §§ 34, 39. That is how Plaintiff suffered physical injury as a result of the Defendants' participation in Montgomery's on-going computer hacking. Needless to say, in today's world where most people maintain their personal and business information on their computers and communicate primarily through electronic means, it is only reasonable for the ordinary person to suffer significant stress if they knew that not only did they have no privacy in their email communications but that all their electronic information was in the hands of their adversaries who were engaged in a "win-at-all costs" litigation campaign. This is what happened to Plaintiff with Montgomery and the Defendants gaining unauthorized access to his computers and using the information gained from that hacking to beat Plaintiff into submission, as this Court has found in its Sanctions Order.

For purposes of ruling on a motion to dismiss under Rule 12(b)(6), this Court must accept as true all material facts in the FAC and construe them in a light most favorable to Plaintiff. *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996). Under this standard, Plaintiff adequately alleges that the Defendants' conduct in violation of 18 U.S.C. § 1030 caused a "flare-up" of his shingles. Thus, Defendants' argument in this regard is unavailing and their Motion to Dismiss on this point must accordingly be denied.[2]

B.    <u>Plaintiff Has Stated a Plausible Claim of Aiding and Abetting Violations of 18 US.C. § 1030 Against Defendants</u>

As to "plausibility" and satisfying the pleading standards of F.R.C.P. 8, Plaintiff has met this standard and in fact met this standard in his original Complaint. Nevertheless, Defendants misconstrue this Court's October 15, 2010 order in an attempt to argue that Plaintiff has not "cured" the pleading defects previously identified by this Court with respect to his claims under

_____

[2] At several points in its Motion to Dismiss, Defendant incredibly argues that Plaintiff is to blame for Defendants' violation of 18 U.S.C. § 1030 because Plaintiff did not take adequate security measures to protect his computer from Montgomery's unauthorized access. See e.g., Motion to Dismiss at p. 13, n. 5. Defendant cites no legal authority to support its position that Plaintiff's supposed fault in this regard should justify granting a Rule 12(b)(6) motion to dismiss.

1   18 U.S.C. § 1030.  This Court previously identified that as to Defendants Pham and Klar,

2   Plaintiff's Complaint was deficient because it did not discuss when Montgomery hacked, what

3   Pham and Klar did to aid and abet that hacking or how Pham and Klar used the hacked

4   information.  Order at Docket No. 70, p. 12.[3]

5          Plaintiff's FAC cures these defects and more than satisfies F.R.C.P. 8 and the

6   "plausibility" standards set forth under *Twombley* and *Iqbal*.

7          Plaintiff's FAC details the timeframe when the alleged computer hacking occurred.  The

8   FAC at ¶¶ 12, 15, 21, 22, 23, 24, 25, 26, 27, 29, 34 describes how the hacking occurred against

9   Plaintiff beginning in June of 2007 and that throughout the summer and fall of 2007 continued

10  and was used by Pham and Klar as they initiated proceedings against Plaintiff in California and

11  Massachusetts in their litigation war against Plaintiff.  Thus, Defendants' argument that "there are

12  no specific allegations in the FAC from which it may be inferred that Klar and Pham engaged in

13  any activity after July of 2007" is simply contrary to the facts alleged in the FAC.  The FAC

14  specifies how Pham and Klar in the summer and fall of 2007 (¶¶ 12, 15, 29), began using

15  information gained by Montgomery's hacking against Plaintiff in their litigation war against

16  Plaintiff and this conduct continued throughout the eTreppid case (¶33) and as this Court knows,

17  this conduct continued until the senior partners at the Defendant Liner firm intervened in July of

18  2008.  Moreover, the Sanctions Order which this Court may consider details how Pham's and

19  Klar's litigation war against Plaintiff commenced in August of 2007 with their objection to

20  Plaintiff's retaining lien and then spiraled out of control from there as they filed perjured

21  declarations, initiated bar complaints, initiated fee arbitration proceedings, filed two writs of

22  possession on behalf of Montgomery in September and October of 2007 and then subsequently

23  attempted to defend their wrongful conduct throughout this time and in November of 2007.

24  Sanctions Order at pp. 14-32.  Additionally, the FAC also describes how the object of Defendants

25  Pham and Klar, and Edra Blixseth and Montgomery throughout this time and continuing through

26  the early part of 2008 was to crush Plaintiff into submission to prevent him from revealing their

27  fraud on the U.S. Government and toward this end they defrauded banks and lenders and hacked

28  _____

[3] Allegations under § 1030 are not subject to the heightened pleading standard of F.R.C.P. 9 and therefore "time, place, manner" allegations are not required.

into Plaintiff's computers throughout the pendency eTreppid case.  FAC at ¶¶ 31, 33, 46, 47.

Thus, contrary to Defendants' argument, the FAC adequately alleges when the hacking and aiding

and abetting occurred and the allegations are explicit that such conduct occurred after July of

2007.

The FAC also details how Pham and Klar aided and abetted Montgomery's computer

hacking by encouraging him to do so and then knowingly using information that Montgomery

gained from his hacking in their litigation war against Plaintiff, the purpose of which was to beat

Plaintiff into submission so that he would not expose the fraudulent technology.  FAC at ¶¶ 17,

22-33, 46.

The specific facts detailed in the FAC most certainly satisfy the "plausibility" standards

under *Twombley* and *Iqbal* because they provide detailed facts concerning the Defendants' aiding

and abetting Montgomery's violations of 18 US.C. § 1030 and most certainly provide more than a

"formulaic recitation of the elements of a cause of action", which *Iqbal* sought to do away with.

Thus, Plaintiff has satisfied his burden under F.R.C.P. 8.

C.    **Plaintiff's Allegations Fall Within the Statute of Limitations Under 18 U.S.C.
§ 1030**

"A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the

applicable statute of limitations only when the running of the statute is apparent on the face of the

complaint."  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir.

2010) (quotation omitted).  The statute of limitations under 18 U.S.C. § 1030(g) is "2 years of the

date of the act complained of or the date of the discovery of the damage."  Notably, the language

of § 1030(g) allows the two-year limitations period to begin accruing on either alternative trigger

event without imposing an "earlier of" limitation on the accrual date.

Here, the allegations in the FAC fall within the statute of limitations under § 1030(g) in

two ways.  First, the allegations in the FAC describe how beginning in at least August of 2007

and continuing through the fall of 2007, Defendants Pham and Klar were aiding and abetting

Montgomery's computer hacking and using the information gained from that hacking in their

litigation war against Plaintiff.  FAC at ¶¶ 29-33.  Thus, at the earliest, the statue of limitations

under § 1030(g) expired on August of 2009, which is one month <u>after</u> Plaintiff filed his original

Complaint in July of 2009.  Second, § 1030(g) alternatively allows the statute of limitations to

begin running on the date of the discovery of the damage.  As alleged in the FAC, Plaintiff first

suffered his compensable damage in October of 2008, which puts the filing of his original

Complaint on July 31, 2009 well within the two-year statute of limitations.

Thus, Plaintiff's allegations in the FAC fall well within the two-year statute of limitations

under § 1030(g).

### D.    A Civil Claim for Aiding and Abbeting Violations of 18 U.S.C. § 1030 is Actionable

Like the Defendant Liner firm, Defendants Pham and Klar argue that aiding and abetting

is not actionable under 18 U.S.C. § 1030.  See Motion to Dismiss at p. 14-15, Docket No. 90.

Defendants Pham and Klar are wrong.  Section 1030(b) provides that "Whoever conspires to

commit or attempts to commit an offense under subsection (a) of this section shall be punished as

provided in subsection (c) of this section."  18 U.S.C. § 1030(b).  Secondary liability under §

1030(b) for violations of § 1030(a) is not limited merely to criminal punishment but exposes the

secondary violator to civil liability as well.  *See Capitol Records, Inc. v. Weed*, 2008 WL 1820667

at *5 (D. Ariz., April 22, 2008) (upholding civil conspiracy claim under 18 U.S.C. § 1030).

In particular, § 1030(g) provides a civil remedy against a "violator" "of this section [i.e., §

1030 as a whole]."  18 U.S.C. § 1030(g).  Logically, because § 1030(b) provides that a person

who conspires to violate § 1030 is a "violator" of that section, then necessarily this secondary

violator is subject to civil liability under § 1030(g).  As discussed in Plaintiff's opposition to

Defendant Liner firm's motion to dismiss, this interpretation is consistent with the Ninth Circuit's

decision in *Freeman v. DirectTV, Inc.*, 457 F.3d 1001 (9th Cir. 2006); see also *Capitol Records,

Inc. v. Weed*, 2008 WL 1820667 at *5 (D. Ariz., April 22, 2008) (upholding civil conspiracy

claim under 18 U.S.C. § 1030).

Nevertheless, Defendants Pham and Klar rely on *Butera v. Andrews*, 456 F.Supp.2d 104

(D.D.C. 2006) for the proposition that if they did not "direct" Montgomery to hack into Plaintiff's

computers, then they cannot be held liable under 18 U.S.C. § 1030.  Defendants' reliance on

1    *Butera* is misplaced.  In *Butera*, the plaintiff sued IBM under §1030(a) alleging that IBM had

2    directly violated the provisions of § 1030(a) by allowing an unknown employee to repeatedly

3    gain unauthorized access to plaintiff's computers.  *Butera*, 456 F.Supp.2d at 105-108.

4    Essentially, the plaintiff was attempting to hold IBM vicariously liable for its employee's

5    intentional violation of 18 U.S.C. § 1030.  *Id*. at 111-112.  Notably, the plaintiff's complaint

6    failed to "'alleg[] any knowing, intentional or deliberate actions by IBM'" and did not allege

7    "'that IBM knew about or authorized the attacks ... or that it had any conceivable motive to do

8    so,' . . . ." *Id*. at 109.  Moreover, unlike the present case, the plaintiff in *Butera* made no

9    allegation or sought to hold IBM liable under conspiracy or aiding and abetting theories.  Instead,

10    the claim against IBM was for directly violating 18 U.S.C. § 1030(a), even though there were no

11    allegations that IBM had intentionally violated § 1030 or knew that its employee was violating §

12    1030.  Thus, on the allegations presented in *Butera*, the district court properly dismissed the

13    plaintiff's claim against IBM for directly violating 18 U.S.C. § 1030(a).

14            By contrast, Plaintiff's claims against Defendants Pham and Klar are not for their directly

15    violating § 1030(a) as were the claims in *Butera* against IBM, but rather Plaintiff's claims seek to

16    hold Pham and Klar secondarily liable for aiding and abetting Montgomery's direct violations of

17    § 1030(a).  Thus, it is unnecessary for Plaintiff to allege that Defendants Pham and Klar

18    intentionally or willfully directed Montgomery to hack into Plaintiff's computers, as these would

19    only be necessary allegations if Plaintiff was alleging the Defendants directly violated § 1030(a),

20    and *Butera* is consistent with this point.  Instead, for Defendants Pham and Klar to be secondarily

21    liable under § 1030(b) for aiding and abetting Montgomery's computer hacking, Plaintiff need

22    only allege that they substantially assisted or encouraged Montgomery's computer hacking.  See

23    *G.K. Las Vegas Limited Partnership v. Simon Property Group, Inc.*, 460 F.Supp.2d 1246, 1261

24    (D. Nev. 2006) (elements for aiding and abetting).  The FAC adequately alleges this as it details

25    the win-at-all-costs scheme implemented by Klar and Pham to knowingly use information gained

26    by Montgomery from his computer hacking to perpetrate their litigation war against Plaintiff for

27    the purpose of beating him into submission so that he would not reveal their fraud on the U.S.

28    Government and in this regard substantially assisted Montgomery in his computer hacking

11

1    because their win-at-all-costs litigation war was the reason for Montgomery's computer hacking

2    in the first place.  FAC at ¶¶ 20-33, 43, 46.

3    **4.      PLAINTIFF HAS ALLEGED A CIVIL RICO CLAIM AGAINST DEFENDANTS**

4           **A.      Defendants' Status as Attorneys for Montgomery and Edra Blixseth Does Not**

5                  **Immunize them from RICO Liability**

6           Defendants argue that their status as attorneys for Montgomery and Edra Blixseth should

7    immunize them from RICO liability.  The cases cited by Defendants in support of their argument

8    are not on point.  Citing *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) and *Walter v. Drayson*,

9    538 F.3d 1244 (9th Cir. 2008), Defendants argue that attorneys cannot be liable for conducting

10   the affairs of a RICO enterprise merely because the attorneys happen to perform legal services for

11   the RICO enterprise.  Motion to Dismiss at pp. 18-19.  The Ninth Circuit in *Baumer* and *Walter*

12   found that the allegations presented in those cases demonstrated merely that the attorneys had a

13   "level of involvement insufficient to impute liability" to them for the RICO enterprise.  *Walter*,

14   538 F.3d at 1248.  These cases do not hold as a matter of law that attorneys are immune from

15   RICO liability, only that on the facts alleged in those cases the suspect attorneys could not be

16   subject to RICO liability.  For example, in *Baumer*, the Ninth Circuit held that an attorney who

17   "wrote two letters to the Department [of Corporations], filed a partnership agreement, and helped

18   Erdy in bankruptcy proceedings" was not sufficiently involved in the RICO enterprise for him to

19   be liable because "he played no part in directing the affairs of the enterprise; and his role was

20   limited to providing legal services." *Baumer*, 8 F.3d at 1344.  Similarly in *Walter*, the Ninth

21   Circuit found that the defendant attorney could not be liable under RICO where the attorney only

22   "wrote emails, gave advice, and took positions on behalf of her clients" and there was no

23   indication that the attorney was otherwise directing the enterprise.  *Walter*, 538 F.3d 1248.

24          Notably absent from the allegations against the suspect attorneys in *Walter* and *Buamer*

25   were any allegations that the attorneys themselves engaged in fraudulent conduct.  By contrast, in

26   the present case the FAC details how Defendants Pham and Klar did far more than just provide

27   legal services to the RICO enterprise.  Defendants Pham and Klar actively solicited Wachovia

28   bank to provide $8 million in loans to Edra Blixseth and then affirmatively defrauded Wachovia

1   bank by providing Wachovia with knowingly fraudulent financial statements and fraudulently

2   affirming to Wachovia the veracity of Edra Blixseth's representations to Wachovia regarding her

3   financial condition and the legitimacy of Montgomery's software.  FAC at ¶¶ 45, 46.  The FAC

4   further details how Defendants Pham and Klar repeated this same fraudulent scheme with other

5   lenders in California, Montana and Massachusetts for the purpose of assisting Edra Blixseth in

6   obtaining funds to pay Defendants' legal bills to perpetuate their harassment of Plaintiff and fraud

7   in the U.S. Government.  FAC at ¶¶ 46, 47, 48, 49.  Moreover, absent from *Walker* and *Baumer*

8   but present here, are the facts that Defendants Pham and Klar engaged in conduct that went

9   beyond their legitimate representation of their clients.  As this Court has found in the Sanctions

10  Order, Defendants Pham and Klar abdicated their professional and ethical obligations.  As such,

11  they did not provide legitimate legal services to Blixseth and Montgomery, but engaged in the

12  fraudulent affairs of the RICO enterprise.  These factual allegations regarding Defendant Pham

13  and Klar's intentional fraud on third parties as part of the RICO enterprise distinguishes their

14  conduct from the conduct of the attorneys in *Walter* and *Baumer* and makes those cases

15  inapplicable to the FAC.

16          **B.      Plaintiff Has Alleged that a RICO Enterprise Exists**

17          Without citing authority, Defendants Pham and Klar argue in a conclusory fashion that the

18  FAC fails to allege the existence of a RICO enterprise.  This argument is lacking.  The RICO

19  statute does not specifically define the outer boundaries of the "enterprise" concept but states that

20  the term "includes any individual, partnership, corporation, association, or other legal entity, and

21  any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. §

22  1961(4); *Boyle v. United States*, 129 S. Ct. 2237, 2243 (2009).  What constitutes an enterprise is

23  obviously broad, encompassing "any . . . group of individuals associated in fact." *Id.*  The term

24  "any" ensures that the definition has a wide reach, see, e.g., *Ali v. Federal Bureau of Prisons*, 552

25  U.S. 214 (2008), and the very concept of an "association in fact" is expansive.  Emphasizing the

26  breadth of the definition of "enterprise," the Court has held that the RICO statute provides that its

27  terms are to be "liberally construed to effectuate its remedial purposes."  *Boyle*, 129 S.Ct. at 1276.

28  An "association in fact" comprises "persons associated together for a common purpose of

13

1    engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  An

2    association in fact enterprise must have at least three structural features: a purpose, relationships

3    among those associated with the enterprise, and longevity sufficient to permit these associates to

4    pursue the enterprise's purpose." *Boyle*, 129 S.Ct. At 1277.  However, at bottom, an association

5    in fact enterprise is simply a continuing unit that functions with a common purpose.  *Id.*

6         The facts alleged in the FAC adequately demonstrate that Defendants Pham and Klar, and

7    Montgomery and Blixseth were an association in fact.  Defendants Pham and Klar began

8    representing Montgomery and Blixseth in July of 2007 and as this Court knows, ceased their

9    representation within the eTreppid case in July of 2008, yet Defendant Klar continued

10   representing Edra Blixseth through at least August of 2008.  During that time, the FAC alleges

11   that Defendants most certainly formed a continuing unit with Edra Blixseth and Montgomery who

12   collectively had the purpose of beating Plaintiff into submission to silence him from revealing

13   their fraud on the U.S. Government and to accomplish that end, they all engaged in defrauding

14   banks and lenders to fund their litigation war against Plaintiff and their fraud on the U.S.

15   Government.  FAC at ¶¶ 7-14, 18, 43-50.  In this regard, the enterprise element of Plaintiff's

16   RICO claim has been satisfied.  Defendants cite no authority to support their position that their

17   status as attorneys in this scheme defeats the enterprise element and the idea that they only

18   fraudulently induced banks and lenders "sporadically" is unpersuasive and contrary to the

19   allegations in the FAC.  Defendants along with Blixseth and Montgomery were engaged in an on-

20   going scheme to beat Plaintiff into submission and win at all costs and obtained over $67 million

21   in fraudulently procured loans between July of 2007 and August of 2008 to fund their harassment

22   of Plaintiff and to perpetrate a fraud on the U.S. Government.  Most assuredly Defendants were

23   part of an association in fact to perpetuate this scheme as they were a critical part thereof.

24        **C.    Plaintiff Has Alleged a Pattern of Racketeering Activity**

25        Defendants argue that they are not on notice of what pattern of racketeering activity

26   Plaintiff is alleging that they engaged in.  Motion to Dismiss at pp. 20-21.  This is a disingenuous

27   argument.  Defendants Pham and Klar purport to define "pattern of racketeering activity" by

28   setting forth only a portion of that definition as found in 18 U.S.C. § 1961(1)(A).  They then

14

complain that none of the allegations in the FAC fit within the partial definition that they provide in their Motion to Dismiss and then complain that Plaintiff has not plead with sufficient specificity to put them on notice of their wrongdoing.  This is argument intentionally ignores to detailed facts of financial institution and mail and wire fraud contained within Paragraphs 43-49 of the FAC, this argument also ignores that the fact that 18 U.S.C. § 1961 specifically defines financial institution and mail and wire fraud as racketeering activity.  See 18 U.S.C. § 1961(1) ("'racketeering activity' means . . .(B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud) . . . .).  Again, the FAC details how Defendants Pham and Klar through the use of the mails, emails, phones and other means of interstate communications defrauded financial institutions and lenders in California, Montana and Massachusetts of over $60 million through false representations regarding the legitimacy of Montgomery's technology and through the use of false financial statements.  FAC at ¶¶ 43-50.  Accordingly, Defendants' argument that Plaintiff's FAC lacks allegations of a pattern of racketeering activity is simply contrary to the allegations therein.

### D.     Defendants' RICO Conduct was the Direct Cause of Plaintiff's Injury

Defendants argues that Plaintiff's RICO cause of action must be dismissed because there is purportedly no direct causation between Defendants' bank fraud and Plaintiff's harm.  Motion to Dismiss at pp. 10-11 (for example "individual and institutional lenders were the victims of the alleged scheme to obtain fraudulent loans").  Plaintiff's allegations regarding Defendants' participation in defrauding banks establishes one of the predicate acts that Defendant committed in furtherance of the RICO scheme.  However, contrary to what Defendant argues, a civil RICO plaintiff does not need to be the direct victim of each predicate act, the plaintiff need only be the direct victim of the RICO scheme.

After showing that the plaintiff has sufficiently alleged an "injury to business or property," a plaintiff must next show that the injury was proximately caused by the RICO scheme.  *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992).  "Proximate cause" only requires "some direct relation between

the injury asserted and the injurious conduct alleged." *Id.*  However, "the term "proximate cause" does not easily lend itself to definition."  *McBride v. CSX Transp., Inc.*, 598 F.3d 388 (7th Cir. 2010).  Indeed, with respect to the concept of proximate cause, one noted commentator has stated:

> There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion.  Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement to the best approach.

W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 41 at 263 (5th ed. 1984). See *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 175 L. Ed. 2d 943, 2010 WL 246151, *5 (2010) (stating that "[p]roximate cause for RICO purposes . . . should be evaluated in light of its common law foundations" and "requires some direct relation between the injury asserted and the injurious conduct alleged").  Under the "common-law foundations" of proximate cause, the *Hemi* court merely applied the standard requirement that there be some direct relation between the injury and the conduct.  Thus, there is liability for both "all 'direct' (or 'directly traceable') consequences and those indirect consequences that are foreseeable."  Prosser and Keeton § 42, at 273; see also id., § 43, at 294, and n. 17.  The concepts of direct relationship and foreseeability are not mutually exclusive, but instead "two of the many shapes proximate cause took at common law."  *Hemi*, 139 S.Ct at 14.

The Supreme Court has addressed civil RICO's causation requirements in three key cases, *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992), *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 453, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006) and the Supreme Court's recent decision, *Hemi Group v. City of New York*, 2010 U.S. LEXIS 768 (U.S., Jan. 25, 2010).

In *Holmes*, the Court focused on § 1964(c)'s requirement that the claimed injury be "by reason of a defendant's RICO violation."  See 18 U.S.C. § 1964(c).  In that case, after losses due to a stock manipulation scheme caused two broker-dealers to fail, the Securities Investor Protection Corporation ("SIPC") had to pay over $13 million in claims to customers of the broker-dealers after the broker-dealers were unable to meet their obligations to its customers. SIPC sued the defendants pursuant to RICO, claiming that because of the fraudulent stock

1   manipulation scheme, SIPC had to pay customers of the failed broker-dealers.  Significantly,

2   SIPC was not bringing the action on behalf of customers of the broker-dealers that had lost

3   money in the stock scheme.

4   　　　Rejecting SIPC's claim as lacking proximate cause, the Court held that a plaintiff must be

5   able to show that the violation was not only the 'but for' cause of the injury, but also the

6   proximate cause, which "demand[s] for some direct relation between the injury asserted and

7   injurious conduct alleged."  *Id*. at 268.  The *Holmes* Court noted the following three policy

8   reasons for requiring proximate causation in the RICO context: (1) the factual difficulty of

9   measuring indirect damages and distinguishing among distinct independent causal factors; (2) the

10   complexity of apportioning damages among plaintiffs "to obviate the risk of multiple recoveries";

11   and (3) the fact that "the need to grapple with these problems is simply unjustified by the general

12   interest in deterring injurious conduct, since directly injured victims can generally be counted on

13   to vindicate the law."  *Id*. at 269.  The alleged harm was SIPC's payment of claims to customers

14   of the failed broker-dealers.  The RICO conduct, however, was the stock manipulation scheme.

15   Thus, any harm befalling the customers was caused by the failure of the broker-dealers, not the

16   loss of money from the stock manipulation scheme.  The Court then held that the injury in

17   Holmes was too remote to allow recovery because it was contingent upon the harm to another.

18   *Id*. at 271 74.

19   　　　In *Anza*, 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed. 2d 720, the Supreme Court found no

20   proximate cause where, although the plaintiff's injury was not derivative as it was in *Holmes*, but

21   it was nevertheless too remote to allow recovery.  In *Anza*, a merchant sued its competitor under

22   RICO alleging that it was injured because the competitor failed to charge sales tax and submitted

23   fraudulent tax returns and, thus, was able to undercut plaintiff's price.  *Id*. at 453-56.  In finding

24   that the plaintiff had inadequately alleged proximate causation, the Court explained that "[t]he

25   cause of [the plaintiff's] asserted harms is a set of actions (offering lower prices) entirely distinct

26   from the alleged RICO violation (defrauding the State)."  *Id*. at 458.  The alleged RICO violation

27   directly caused the State to be defrauded of taxes, not the plaintiff to lose money to its competitor.

28   *Id*.

1   The Supreme Court's most recent pronouncement on proximate cause in the civil RICO

2   context is found in *Hemi*.  That case involved a city tax on those who possess cigarettes.  *Id*. at

3   986.  In state sellers were required to collect the tax from purchasers and pay it to the city but out

4   of state sellers were not.  *Id*. at 987.  Instead, the city was responsible for recovering the tax

5   directly from the purchasers.  *Id*.  The city required out of state sellers to register and file a report

6   with the state listing the name and address of the in state purchasers.  *Id*.  The city used the report

7   to track down cigarette buyers who had not paid their possession taxes.

8   The defendant in *Hemi* was an out of state cigarette seller who sold cigarettes to

9   purchasers online but did not file the required reports with the state.  *Id*.  The city filed suit

10   against the defendant, alleging that its failure to file the reports constituted the RICO predicate

11   offense of mail fraud.  *Id*.  It asserted its injury was "lost tax revenues."  *Id*. at 987 88.  The

12   Supreme Court determined that the city could not establish the causation required under RICO

13   because it could not establish it had suffered the injury "by reason of" the alleged fraud as

14   required by § 1964(c).  *Id*. at 988.

15   "The conduct directly responsible for the City's harm was the customers' failure to pay

16   their taxes.  And the conduct constituting the alleged fraud was [the defendant's] failure to file. . .

17   reports."  *Id*. at 990.  Accordingly, "the conduct directly causing the harm was distinct from the

18   conduct giving rise to the fraud."  *Id*.  Instead, a plaintiff must show that the fraudulent conduct

19   led directly to the plaintiff's injuries.  *Id*. at 992.  Because the city's injuries "were not caused

20   directly by the alleged fraud," the injuries were not caused "by reason of" the fraud.  Thus, the

21   RICO claim failed.  *Id*. at 994.

22   Here, Plaintiff's injuries were caused directly and in fact were the object of the

23   Defendants' RICO scheme of harassing and intimidating Plaintiff to deny him legal fees to which

24   he was entitled and to silence him so that he would not expose their fraud on the U.S.

25   Government.  As alleged in the FAC (¶¶ 43-49), Plaintiff was the target of Defendants' scheme,

26   and Defendants funded this scheme through the predicate acts of defrauding banks and lenders.

27   This is not the type of "attenuated" or "remote" chain of causation that the Supreme Court in

28   *Hemi* or *Holmes* has found to defeat a civil RICO claim.  The conduct directly responsible for

1   Plaintiff's harm was Defendants' participating in defrauding banks and lenders because only

2   through defrauding bank and lenders could Defendants fund their scheme against Plaintiff.

3   Unlike in *Anza* or *Hemi* where the Supreme Court was concerned about nebulous and multi-step

4   causation analyses (policy (1) identified in *Holmes*, *supra*), there is a direct, one-step link in the

5   chain of causation between Defendants obtaining fraudulent proceeds, and then using those loan

6   proceeds to fund its harassment and intimidation scheme against Plaintiff.  Moreover, the concern

7   of the Supreme Court in *Holmes* regarding apportioning damages amongst an endless sea of

8   plaintiffs (policy (2) indentified in *Holmes*, *supra*) is not present.  The universe of plaintiffs is

9   limited to Mr. Flynn and his damages are concretely identifiable as he was the sole target of

10  Defendants' RICO scheme.

11      In short, Plaintiff has suffered damages that are directly attributable to Defendants' RICO

12  scheme and were caused in fact and intended to be caused through Defendant defrauding banks

13  and lenders as alleged in the FAC.

14      Defendants nevertheless argue that Plaintiff cannot state a RICO claim on the facts alleged

15  because his costs incurred in defending himself were caused by this conduct.  This This specious

16  argument ignores the facts alleged in the FAC and the litigation that has occurred before this

17  Court in the eTreppid case.

18      As the FAC alleges and as this Court knows, Defendant represented Montgomery and

19  Edra Blixseth in the eTreppid case and it was within this context that Defendants engaged in the

20  alleged wrongful conduct from the summer and fall of 2007 through the fall of 2008.  In the

21  eTreppid case, Defendants engaged in a pattern of conduct to harass and intimidate Plaintiff

22  culminating in March 3, 3009 when this Court issued a Sanctions Order in the eTreppid case in

23  which it stated:

24          The court concludes that the animosity Mr. Montgomery and Ms.
             Blixseth harbored for Mr. Flynn would never be paid and to <u>crush
25           him into submission in the process.</u>  By her conduct as lead counsel
             in these proceedings, Ms. Klar allowed her clients to involve the
26           Liner firm, Ms. Pham and herself in a scheme to exploit legitimate
             legal proceedings to harass and punish Mr. Flynn.  Ms. Klar crossed
27           over the line as a zealous advocate for her clients' interests and
             abdicated her ethical and professional duties to the court in

28

advancing this strategy.  (Case No. 3:06-cv-00422, Docket No. 985 at pp. 45-46) (emphasis added).

. . .

Ms. Klar was allowed to operate in the Liner firm unchecked and unquestioned, and this conclusion is supported by her pattern of sanctionable conduct that ensued <u>long after the fall of 2007</u>.  It was not <u>until matters came to a head in the summer of 2008</u> that senior partners finally stepped in to this case.  The court finds that the Liner firm acquiesced to or willingly carried out Ms. Klar's litigation strategy; therefore sanctions against the Liner firm are warranted pursuant to 28 U.S.C. § 1927.  (*Id*. at p. 48) (emphasis added).

. . .

<u>In July 2008</u>, senior partners in the Liner firm finally stepped into this case, but this was only after several sanction orders had been issued, and both Ms. Klar and Mr. Montgomery were facing very serious allegations unrelated to the issues currently before this court.  It was also months after Ms. Klar's unsuccessful campaign to divest this court of jurisdiction and to defeat Mr. Flynn at any cost.  (*Id*. at p. 50.).

Consistent with the Sanctions Order, Plaintiff's FAC (¶¶ 34, 39), alleges that the harassment engaged in by Defendants continued throughout 2007 and 2008 because the stress of this on-going harassment manifested itself when Plaintiff suffered his debilitating case of shingles from October to December of 2008.  Thus, the fraudulent loan proceeds that Defendants procured during this time period were being used to continue the harassment and intimidation of Plaintiff as alleged.  Moreover, the Sanctions Order recognizes that the Defendants' harassment and intimidation of Plaintiff occurred up until at least July of 2008 when the senior partners of Defendant Liner firm finally realized that they had allowed Ms. Klar and Ms. Pham to operate "unchecked" for far too long.  Again, this harassment was funded by the fraudulent loan proceeds that Defendants were procuring for Edra Blixseth during this time period.  Most specifically, the FAC alleges that in November and December of 2007, Defendants assisted Edra Blixseth in receiving $9.5 million in fraudulent loan proceeds from American Bank.  FAC at ¶ 47.  This is the critical time in which Defendants engaged in the specifically identified wrongful conduct of filing bar complaints in California and Massachusetts, filing knowingly perjured declarations, initiating arbitration proceedings in San Diego, and seeking two writs of possession in California

state court.  Assuming the truth of the allegations in the FAC and assuming all facts exist to support the allegations and inferences in the FAC, it is appropriate to view all the fraudulent loan proceeds identified in the FAC as necessary to pay Defendants for all concurrently incurred and delinquent legal bills owed to Defendants for their legal services rendered on behalf of Montgomery and Edra Blixseth beginning in the fall of 2007 and continuing until March of 2009 when this Court finally and appropriately sanctioned Defendants for their harassment and intimidation of Plaintiff.  In other words, Defendants billed Montgomery and Edra Blixseth for the harassment of Plaintiff then got paid for it by means of the fraud on banks and lenders as alleged in the FAC.

Plainly then, there is a direct causational link between Plaintiff's injury and Defendant's RICO conduct.

### E.        Plaintiff Has Alleged Sufficient Facts to Establish a RICO Conspiracy

Consistent with *Twombley* and *Iqbal*, Plaintiff has provided detailed facts which make it apparent that the only way Defendants Pham and Klar could have engaged in their bank and lending fraud was through an agreement with Edra Blixseth and Montgomery to do so for the purpose of continuing to fund their harassment of Plaintiff.  FAC at ¶¶ 43-50.  Defendants complain that because Plaintiff did not use the magic word "agreement" in count six of his FAC, that his RICO conspiracy claim must fail.  Such a rote pleading requirement was done away within by *Twombley* and *Iqbal*.  That Defendants Pham and Klar had an agreement with Blixseth and Montgomery to engage in a RICO enterprise and to commit the predicate acts of mail, wire, banking and lending fraud is easily inferred from the allegations throughout the FAC.  Again, such an agreement is the inherent reason why Defendants committed over $60 million in lending fraud against lenders in California, Montana and Massachusetts.  See also *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (rejecting requirement of rote recitation of elements of cause of action); *Canyon County*, 519 F.3d at 982 (this Court must "presume that general allegations embrace those specific facts . . . necessary to support the claim.")

### 5.        PLAINTIFF HAS ADEQUATELY ALLEGED A CAUSE OF ACTION FOR

**AIDING AND ABETTING INVASION OF PRIVACY**

Although Defendants cursorily claim that Plaintiff's FAC is void of facts identifying how Defendants substantially assisted or encouraged Montgomery in invading Plaintiff's privacy, this argument ignores the facts enumerated in the FAC.  FAC at ¶¶ 27, 28, 29, 30, 31, 32, 33.  As an initial matter, when determining the sufficiency of a complaint alleging a civil aiding and abetting cause of action and whether the complaint satisfies the "substantial assistance" element of the claim, the court's focus on the defendant's knowledge of the specific primary wrong being committed against the plaintiff.  *Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th at 1145.  For example, "[i]n *Lomita Land Water Co. v. Robinson* (1908) 154 Cal. 36, 97 P. 10 (*Lomita*), the California Supreme Court explained this requirement in the course of affirming a judgment against two defendants for aiding and abetting a fraudulent land sale scheme engineered by two others.  The court stated, "'The words 'aid and abet' as thus used have a well understood meaning, and may fairly be construed to imply an intentional participation with knowledge of the object to be attained.'  Finding the defendants had 'actual knowledge of all the facts relevant to' the scheme and 'knowingly' assisted in its 'consummation,' the court concluded they were rightly held liable for aiding and abetting the fraud."  *Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th at 1145-1146 (citations omitted).

Pursuant to his requirements under F.R.C.P. 8 and *Iqbal*, Plaintiff has sufficiently alleged facts to implicate Defendants' liability for aiding and abetting Montgomery's computer hacking.  Plaintiff's FAC alleges that Defendants gained specific knowledge of Montgomery's computer hacking when Plaintiff repeatedly informed them of this fact on repeated occasions.  FAC at ¶¶ 17, 22, 27, 28, 29, 30, 31.  With knowledge of Montgomery's modus operandi to gain unauthorized access into the computers of his adversaries to gain litigation advantages, the FAC then alleges that Defendants substantially assisted Montgomery's continuing invasion of Plaintiff's privacy by using the information Montgomery gained in violation of Plaintiff's privacy throughout the eTreppid case against Plaintiff, thereby consummating the scheme and purpose of Montgomery's invasion of privacy.  FAC at ¶¶ 17, 22, 27, 28, 29, 30, 31, 32, 33; *see also Casey v. U.S. Bank National Ass'n*, 127 Cal.App.4th at 1145-1146.

**6.      PLAINTIFF HAS ADEQUATELY ALLEGED CONSPIRACY CLAIMS AGAINST DEFENDANTS**

Defendants Pham and Klar argue that they should not be liable for conspiring to invade Plaintiff's privacy because their status as attorneys for Montgomery absolve them of such liability.  Defendants Pham and Klar cite no Nevada legal authority for their position.  Curiously, Defendants quote from *Stiles v. Onorato*, 457 S.E.2d 601 (S.C. 1995) to support their position that an attorney cannot conspire with his or client.  Motion to Dismiss at p. 29.  Defendants' reliance on *Stiles* is perplexing because the case is quite contrary to the Defendants' position.  Omitted from Defendants' analysis of *Stiles* is the Supreme Court of South Carolina's holding therein that an attorney is not immune from conspiracy claims when he or she acts in bad faith or outside the scope of his or her professional capacity.  *Stiles*, 457 S.E.2d at 299-300.  As detailed in the Sanctions Order, Defendants' representation of Blixseth and Montgomery in the eTreppid case consisted exclusively of bad faith conduct toward Plaintiff.  As discussed in *Stiles*, Defendants' immunity from conspiracy exists only so long as they acted in their professional capacity.  As soon as they engaged in their bad faith, sanctionable and unprofessional conduct against Plaintiff (which occurred almost as soon as they began representing Montgomery), they lost their immunity from civil conspiracy claims.  *Id.*; Sanctions Order at p. 37, 45-46, 48 ("Ms. Klar crossed over the line as a zealous advocate for her clients' interests and abdicated her ethical and professional duties to the court in advancing this strategy." "Even if Ms. Klar and Ms. Pham's conduct was not totally frivolous, the court finds they were motivated by vindictiveness and bad faith." "As the senior attorney and lead counsel in this case, Ms. Klar abdicated her duties to the court and the attorneys she supervised by engaging in a consistent pattern of gamesmanship, misrepresentations, and outright contempt of this court and its orders.")

This rule of law only makes good sense.  As soon as an attorney begins to indulge in and take advantage of the bad faith and tortious conduct of his or her client, which Defendants did here, that attorney should not be allowed to use his or her Bar license as a shield from liability for such conduct.  Any other rule of law only serves to malign the legal profession.

Here, the FAC alleges in sufficient detail that Defendants knowingly used information that

1   Montgomery gained by hacking into Plaintiff's computer (which constituted a violation of 18

2   U.S.C. § 1030 and the tort of invasion of privacy) for the purpose of harassing and intimidating

3   Plaintiff in litigation.  FAC at ¶¶ 9, 10, 11, 12, 13, 14, 15, 16, 17, 25, 26, 27, 28-34, 56, 57, 58.

4   These detailed factual allegations show the existence of an agreement between Defendants and

5   Montgomery to improperly harass and intimidate Plaintiff into submission by employing

6   scorched earth litigation tactics.  As this Court likely knows, Defendants did engage in and were

7   sanctioned for this improper conduct.  See Docket No. 985, Case No. 3:06-cv-56.  Moreover, the

8   FAC alleges, and this Court must presume that Defendants knew that to further this unlawful

9   objective, Montgomery was invading Plaintiff's privacy and violating 18 U.S.C. § 1030 by

10  hacking into Plaintiff's private computer.

11      Thus, Plaintiff has adequately alleged the required elements of a civil conspiracy for

12  purposes of Rule 12(b)(6).

13  **7.**    **CONCLUSION**

14      Defendants' motion to dismiss should be denied.

15

16      Dated this 25th day of February, 2011

17                                    _____

18                                    Peter Chase Neumann, for Plaintiff

19

20              **CERTIFICATE OF SERVICE ON OPPOSING COUNSEL**

21      Pursuant to FRCP 5(b), I certify that I am Peter C. Neumann, co-counsel for Plaintiff and

22  that on this 25th day of February, 2011, I caused to be served a true and correct copy of the

23  foregoing RESPONSE IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED

24  COMPLAINT by means of filing with the ECF system upon all counsel who have appeared

25  herein, including David Grundy, Alice Campos Mercado at Lemons, Grundy & Eisenbert, 6005

26  Plumas Street, Reno, NV 89519 (attorneys for defendants Klar and Pham), and Daniel T.

27  Hayward, Lxalt & Nomura, 9600 Gateway Drive, Reno, NV 89521, (attorneys for defendant

28  Liner firm).